[No. C054634. Third Dist. Dec. 10, 2008.]

In re RONALD SINGLER on Habeas Corpus.

1228

**1230**

COUNSEL

Michael Satris, under appointment by the Court of Appeal, for Petitioner Ronald Singler.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Heather M. Heckler and Andrew R. Woodrow, Deputy Attorneys General, for Respondent State of California.

OPINION

SCOTLAND, P. J.—In September 1982, Ronald Singler murdered his wife with a shotgun during a heated domestic argument. He was convicted of second degree murder and was sentenced to an indeterminate term of 15 years to life in state prison.

In 2006, the Board of Parole Hearings (the Board) found that Singler was not suitable for parole. Members of the Board acknowledged that what Singler has "been doing while . . . in prison is very impressive," i.e., his conduct as a prisoner has been "extremely positive" "both for self-enhancement and for the enhancement of other people's lives" in that Singler has benefited, as have others, from "all the things that [he has] done" while incarcerated. Nevertheless, because of the "terrible" manner in which he murdered his wife (after arguing with her, he went into the garage, loaded a shotgun, and fatally shot her in the living room while their two young children were in the house) and then disposed of the body (by dumping it in a rural area), Board members concluded Singler had not persuaded them that he has demonstrated sufficient "insight" regarding what caused him to deal with his anger in such a violent way to convince them that, if released on parole, he would not react in a violent manner if future events cause him to become angry. In other words, the Board found that Singler would pose a danger to public safety if released on parole at that time.

On February 1, 2007, Singler's petition for writ of habeas corpus was summarily denied by this court. In concluding Singler did not make a prima facie showing for relief, we construed the California Supreme Court's holding in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*) as compelling us to deny the petition.

On April 25, 2007, the California Supreme Court granted Singler's petition for review and transferred the matter to this court, with directions to vacate our denial of the petition and to order the Board to show cause why it "did

not abuse its discretion and violate due process in finding petitioner unsuitable for parole in June 2006, and why petitioner remains a danger to public safety. (See, Pen. Code, § 3041; *In re Rosenkrantz*[, *supra*,] 29 Cal.4th [at p.] 683; *In re Elkins* (2006) 144 Cal.App.4th 475, 496–498 [50 Cal.Rptr.3d 503]; *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931]; *In re Scott* (2005) 133 Cal.App.4th 573, 594–595 [34 Cal.Rptr.3d 905].)" This court issued the order to show cause, and the Board has filed its return.

On March 26, 2008, no longer giving the Board the deference to which we thought it was entitled (*Rosenkrantz, supra,* 29 Cal.4th at pp. 655, 665, 677, 679), we held its decision finding Singler unsuitable for parole was not supported by the evidence presented at the time of the hearing.

On July 9, 2008, the California Supreme Court again granted review, but deferred further action on this case pending its "consideration and disposition of a related issue in *In re Lawrence*, S154018, *In re Shaputis*, S155872, and *In re Jacobson*, S156416 (see Cal. Rules of Court, rule 8.512(d)(2)), or pending further order of the court."

On October 28, 2008, the Supreme Court transferred this matter to us with directions to vacate our decision and to reconsider the case in light of *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (hereafter *Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573].

We have done so and again conclude that the Board's decision finding Singler unsuitable for parole was not supported by the evidence presented at the time of the hearing. Thus, we will again grant his petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of September 3, 1982, during an argument with his wife, Gayle, Singler got a shotgun from the garage, loaded it, and fatally shot Gayle in the living room while their children were asleep in the house.[1] According to Debbie G., who was Gayle's friend and a neighbor, Singler and Gayle had been having marital difficulties for months, Singler had been mentally and physically abusive, and he had previously threatened Gayle with a shotgun. The two women planned to leave their husbands and live together.

---

[1] Because Singler and the victim shared the same last name, we refer to the victim by her first name, Gayle, for simplicity and to avoid confusion.

According to Singler's statement in the probation report prepared for the sentencing hearing, the couple had been having marital difficulties due to Gayle's compulsive spending and her unusual attachment to Debbie G. On the night of the murder, Gayle and Debbie G. returned from Sacramento about 9:00 p.m. An argument ensued, and Gayle told Singler about a recent sexual affair and her plans to divorce him, take the children, and leave Singler destitute. All of the emotions and anxieties that had been building "just went to a point of no control," and he shot Gayle. When their daughter awakened upon hearing the gunshot, Singler told her he had shot a skunk. Singler then drove the children to a friend's house, returned home for Gayle's body, and dumped it in a rural area.

On the night of the murder, Debbie G. attempted to telephone Gayle, who did not answer the call. Debbie G. later saw Singler's truck backed up against the front steps of the residence. When she telephoned again, Singler answered the phone but would not let her speak to Gayle, stating they had worked everything out and she was asleep and could not be awakened. When Debbie G. went to the house, Singler's truck was gone, the children were missing, and the front porch appeared wet. Debbie G. returned home and telephoned the police.

The responding officers found bloodstains on the deck and in the house. While they were examining the residence, Singler arrived and explained that his wife was spending a week in Lake Tahoe. He stated he had left the children with friends because his wife and he had been arguing. After being informed of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), Singler initially denied any wrongdoing but eventually admitted shooting Gayle and dumping her body in a rural area. He showed the officers where he left Gayle, and they recovered her body.

Singler entered a "slow plea" to an unlawful killing using a firearm, with the trial court determining whether the killing was second degree murder or voluntary manslaughter. The court found Singler guilty of second degree murder. At sentencing, the court struck the firearm use enhancement, observing: "[T]here are different kinds of second degree murder. There are those that arise out of more deliberate action in the course of the crimes that are totally without justification. . . . In this particular case, I recognize that—although I disagreed with the defense over the term of voluntary manslaughter—I do find second degree murder. I never the less recognize it did revolve out of a family dispute for which Mr. Singler will pay dearly for quite a while . . . ."

After Singler was sentenced to a prison term of 15 years to life, the Board set January 30, 1991, as his minimum parole eligibility date.

Singler has no juvenile record or other criminal arrests or convictions. While in prison, he has participated in numerous programs concerning anger management and impulse control. He has completed more than 100 college credits and become active in the Buddhist religion, which has further taught him how to "control" irritation and anger and "not act [i]n anger." He has engaged in volunteer activities, receiving numerous "laudatory chronos," and has worked consistently as a plumber or furniture refinisher. His work supervisor's reports indicate Singler has exceptional work habits and skill levels. He is described as a model prisoner who has an "exemplary disciplinary history," other than the destruction of a blanket in 1983.

According to various psychological evaluations, Singler is "sincerely" ashamed of what he did and remorseful for the pain he caused others. He has reconciled with his children, who write to him and want him to become a part of their lives. His daughter has written several letters asking that he be paroled. In addition, Gayle's mother had no objections to Singler being paroled.

An evaluation prepared by Dr. R. O'Brien, a psychotherapist, in 2002, noted the following: Singler's "loss of impulse control" rose to the "level of violence" at the time of the offense. Multiple factors contributed to this result, including (1) tensions mounted in the marriage over a long period of time, with Singler "holding onto the idea that his marriage could work again," (2) Singler experienced a "sudden and dramatic escalation" in his "baseline level of stress and conflict" and "feelings of betrayal by a person for whom he had trusted and cared," and (3) the "circumstances . . . did not allow him to process what was happening or cool off" before reacting.

In Dr. O'Brien's view, Singler had "taken steps in order to decrease his risk factors for future violent behavior," including "learning and practicing stress management and relaxation techniques such as meditation," and completing numerous self-help programs. And his "behavior and record since incarceration reflect[ed] an ability to manage his emotions and avoid conflicts appropriately." In addition, psychological testing indicated that Singler had "emotional and behavioral stability." Concluding that Singler posed a "moderate to mild risk of violent behavior," O'Brien stated: "Factors that may worsen Mr. Singler's mental state and relative risk of violence include his experiencing the acute loss of significant relationships or feelings of sudden betrayal in [a] relationship in which he is emotionally invested."

In May 2005, at Singler's eighth parole hearing, the Board found that he was suitable for parole after he had served 22 years of his 15-year-to-life prison term. In reaching this conclusion, the Board took into consideration the gravity of the crime; the circumstances that led to it (Singler was experiencing marital difficulties, was "in the heat of an argument" with the victim, and was under "significant stress"); his remorse and acceptance of responsibility; his "reasonably stable relationships with other people, apart from the difficulty that he had in his marriage"; his lack of other criminal history; his participation in numerous self-help programs; his "positive institutional behavior"; the favorable psychological evaluations of Singler; his "realistic parole plans"; and the support he had from his family, including his and the victim's daughter who urged that Singler be paroled. The Board concluded that "because of his maturation" since the killing of his wife, Singler had "a better understanding of himself and how he should have handled the situation"; had developed the "ability to maintain self-control"; and "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

The Governor, in reversing the Board's decision, made the following findings: Singler committed an "atrocious crime . . . with a level of premeditation," while his "two small children slept nearby." His "actions [were] more than the minimum necessary to sustain a conviction for second degree murder," and "[t]his factor alone" demonstrated that Singler "would pose an unreasonable public safety risk." Furthermore, his risk to public safety was shown by the fact that he dumped his wife's body in a rural area, "defiling her in the process," which "was akin to dumping garbage in the wild to be ravaged by animals."

Another parole hearing was conducted in June 2006, which is the subject of the present petition for writ of habeas corpus. The "Life Prisoner Evaluation Report" prepared for the hearing stated Singler has "exceptional work habits" and employable skills, and has maintained an "exemplary disciplinary history." The report noted among other things that Singler's crime was committed "during a time of duress"; Singler was remorseful and ashamed of "the unhappiness he caused [his wife's] family, his children, and his [other] family members"; he received "laudatory chronos" for his participation in "therapy, self-help and educational activities"; and he had "a complete and well thought out parole plan with an excellent source of support through the Veteran's Administration along with the support of his family and friends." The report concluded: "Considering the prolonged circumstances that [led] up to the commitment offense, the absence of a prior criminal record, his prison adjustment, and psychiatric reports, . . . Singler will re-integrate back into society without incident."

An evaluation prepared in April 2005 by a clinical psychologist at San Quentin Prison observed that the then 60-year-old Singler had accepted full responsibility for the crime and expressed a level of remorse that reflected "a genuine understanding of the harm [he caused] and a sincere regret for having committed the crime." Noting that "loss of impulse control" was a causative factor for the murder, the psychologist pointed out that a "person can change 'over time.' " The evaluation summarized Singler's experiences in many programs during his incarceration, Singler's belief he had "learned to walk away from situations that are 'not fixable,' " and his comment, "You can control what you do next, you can let it go, you don't have to act on it." The psychologist opined that Singler posed a "low substantial risk for dangerousness if released to the outside community," given his lengthy period of disciplinary free behavior in prison, his "prosocial" activities, the absence of violent behavior since his arrest, his higher level of emotional maturity, the support of his children, his acceptance into a transitional program that will provide continued supervision in a structured setting, his good prospects for a job in a marketable field from the plumbers union, and his continued support from the Buddhist community.

At the parole hearing, Singler testified as follows:

He and Gayle had been having marital difficulties for months. Sometimes their fights became "pretty bad." Gayle would shove him, and he would slap her on the arm or on the face. They separated after their daughter was born, at which time their debts were "through the roof." He sold some real property and was able to "put [their] finances back to zero." He and Gayle reunited, began seeing a marriage counselor, and had their second child. Singler purchased another property on which to build a home, but Gayle "kept wanting to spend," which led to trouble with finances.

Around that time, Gayle became friends with Debbie G., with whom Gayle associated "a lot"; Gayle would be "[g]one all day, gone all night." Singler had been working extra hours trying to get the home built, and he would often come home to discover that Gayle was not there, and had not taken care of the house or made dinner. Her relationship with Debbie G. caused stress in the marriage.

On the day of the murder, Singler went to the bank to "roll over" the $10,000 that he had saved for home construction, but the teller advised him the account was empty. Singler became very angry because things "had been escalating over months and months." During a heated argument with Gayle that evening, she said she was having an affair, was divorcing him, and was taking the children. Singler went to the garage to get a shotgun with which to

scare his wife, but he then loaded the gun, returned, and fatally shot her in a fit of rage.

Singler was in shock, but realized that he needed to remove his children from the situation; so he drove them to a friend's house, taking care to leave the house via a path that would prevent them from viewing their mother's body. He then returned home, put Gayle's body in the truck, drove to a rural road turnout, and dumped her body.

The Board asked Singler at what point he decided to kill Gayle. Singler replied that he did not remember the exact point because he was in a "fit of rage." He explained that he "didn't have any coping skills at that time," and the "heartbreak" of the loss of all his plans for the future "just completely blew [him] away, [he] just couldn't handle it." He was in a rage and decided he "had to end it all right there on that spot." According to Singler, he and Gayle "had talked all we were going to talk. There was no more, nothing else to discuss. She had already made her statement . . . what she was going to do. And . . . the pure burst of heartbreak, it just ate me up. I just completely blew it."

When asked why he dumped her body "like trash," rather than dealing with it in "another manner that would be appropriate," Singler stated he was in shock and was not thinking rationally. It was not his intention for the animals to dispose of the body as the Board suggested. He simply was trying to get away with the crime and "keep [his] children intact."

Singler explained that the crime occurred because of his anger and, as a result of that, he had "been studying anger since day one." He had studied it extensively, through anger management classes and Buddhist teachings, and learned that anger stems from irritations that are allowed to build. He learned that the catalysts for anger may never change, but that a person can change how he reacts. Singler has learned not to act on his anger. Through Buddhism, he has learned to meditate and to let things go when situations arise that anger him.

Singler expressed remorse for murdering Gayle and, based on his own experience in losing a child during his first marriage, he stated he understood the pain he had caused others. The child's death when he was 36 hours old, and the resulting grief and stress, caused the demise of the marriage. According to Singler, he could only imagine the pain caused by losing a loved one to a violent crime.

Singler explained that if the Board paroled him, he had the total support of his friends and family, and that his children wanted him to be part of their

lives. He had served in the National Guard from 1965 until his honorable discharge in 1971; thus, he had been accepted into three different programs sponsored by the Veterans Administration if he were paroled. Those programs involved placement in transitional housing, the provision of clothing and job opportunities, and access to counselors.

Prior to his incarceration, Singler worked as a journeyman plumber for several years. He planned to continue working in the plumbing trade and had the support of the plumbers union. He wanted to return to the workforce while he was still able to do so.

The Board found that Singler was not suitable for parole even though he had participated in a "plethora of positive activities," his work performance was exceptional, he continued to participate in self-help programs, and he had a lengthy and continuous history of exemplary behavior. As explained by members of the Board, it had concerns about "at what point you [Singler] decided you weren't going to scare your wife you were going to kill her," "how that breakdown happened," and "whether or not the tools are in place that prevent you from going there again." The "conscious loading [of] the gun and making the decision to go in and shoot her," led a Board member to "feel that you [Singler] are young enough to go out there and develop a new relationship," thus a need existed to "identif[y]" the "trigger point . . . so it never happens again." In this regard, a Board member emphasized that Singler decided to shoot his wife despite the fact their two children were in the house and "could have walked into that room." The circumstances of Singler's "disposal of [the] body," also "raised some concerns . . . related to [his] insight." Hence, a Board member remarked that, in addition to the circumstances of the shooting, the "blatant disregard of [the victim's] remains" demonstrated "a massive system failure" as to the "human condition" that "prevent[s] people from doing this kind of thing." The Board member went on to say that Singler had failed to convince the panel that the potential for such a "system failure" to occur again is "not still a part of your being . . . ."

## DISCUSSION

### I

The following legal principles guide our review of the Board's decision:

One year prior to the minimum eligible parole release date of an inmate sentenced to an indeterminate prison term, the Board must "normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the

public . . . ." (Pen. Code, § 3041, subd. (a).) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

■ The Board is required to "establish criteria for the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) A panel of the Board must determine whether the life prisoner is suitable for release on parole, and "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a); further section references are to title 15 of the California Code of Regulations unless otherwise specified.)

■ The Board's regulations set forth nine factors tending to show suitability for release on parole: (1) the absence of a juvenile record; (2) a history of reasonably stable social relationships with others; (3) tangible signs of remorse; (4) the commission of the crime resulted from significant stress, especially if the stress had built over a long period of time; (5) battered woman syndrome; (6) a lack of a history of violent crime; (7) increased age, which reduces the probability of recidivism; (8) marketable skills and reasonable plans for the future; and (9) responsible institutional behavior. (§ 2402, subd. (d).)

Factors tending to demonstrate unsuitability for release on parole include the inmate's (1) commission of the offense in an especially heinous, atrocious, or cruel manner; (2) previous history of violence; (3) unstable social history; (4) prior sadistic sexual offenses; (5) lengthy history of mental problems; and (6) serious misconduct in prison or jail. (§ 2402, subd. (c).)

The importance of those factors is left to the discretion of the parole panel (§ 2402, subds. (c), (d)), and judicial review of the Board's parole decisions is very limited. "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining

whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

However, the deferential review accorded the Board's decision does not mean that courts simply rubberstamp its determination as long as there is some evidence to support any of the unsuitability factors; the "standard is unquestionably deferential, but certainly is not toothless." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) Rather, the reference in *Rosenkrantz* to some evidence to support the Board's decision to deny parole means some evidence to support its ultimate decision that the inmate poses a current risk of danger to society if released from prison. (*Lawrence, supra*, 44 Cal.4th at pp. 1210, 1212; see also *In re Lee, supra*, 143 Cal.App.4th at p. 1408; *In re Tripp* (2007) 150 Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64].)

Accordingly, "to give meaning to the statute's directive that the Board *shall normally* set a parole release date ([Pen. Code,] § 3041, subd. (a)), a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra*, 44 Cal.4th at p. 1212, original italics.)

There must be something "more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness. 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' [Citation.]" (*Lawrence, supra*, 44 Cal.4th at p. 1210.)

■ With respect to the aggravated circumstances of the commitment offense, "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other

evidence of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1211.) In other words, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214, original italics.)

 Thus, "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. [Citation.] Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*Lawrence, supra,* 44 Cal.4th at p. 1221.)

In sum, the Board "may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence, supra,* 44 Cal.4th at p. 1221, original italics.)

II

The Board does not dispute that all of the suitability factors are favorable to Singler. He has no juvenile or adult record. Other than his conflict with his wife, he has a stable social history. He has shown genuine remorse over his killing of his wife. He is over the age of 60, which means that he is of an age

which reduces the probability of recidivism. He has made realistic plans for release. He has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. And there is significant evidence that he committed the crime as a result of significant stress in his life. (§ 2402, subd. (d).)

This, the Board argues, does not mean Singler is entitled to parole. Asserting it need demonstrate only that a modicum of evidence supports any of the unsuitability factors, the Board argues the denial of parole is supported by evidence of Singler's lack of "insight" into what triggered the murder of his wife—specifically "why he 'snapped' and decided to kill [her] rather than simply scare her." According to the Board, Singler's inability to explain this supports its finding that he posed a risk of reacting in a similar way if confronted on parole with an " 'acute loss of significant relationships or feelings of sudden betrayal in [a] relationship in which he is emotionally invested.' "

The problem with this position is its premise that Singler was unable to explain why he turned from intending only to scare Gayle to deciding to kill her. Actually, Singler did explain. According to him, after months of marital difficulty due to Gayle's compulsive spending, he learned from Gayle that she was having an affair with another person, that she wanted to divorce him and take their children, that she had emptied their bank account, and that she threatened to leave him destitute. All of this, he said, caused him to be overcome by rage. He "just completely blew it" because of the heartbreak and loss of his dreams for the future.

Singler went on to explain that he recognized his response was unacceptable and that through therapy and numerous anger management and self-help programs and efforts, including his embracing Buddhism, he had learned appropriate methods to control angry impulses. In his words, because he recognized that he killed his wife in rage, he has "been studying anger since day one" in prison and has learned that the catalysts for anger may never change, but that he can change how he chooses to react.

All of the other evidence disclosed that Singler's efforts to learn anger and impulse control have been successful. Except for the destruction of a blanket when he was first incarcerated in 1983, Singler has been a model prisoner even though life in prison had presented a myriad of opportunities to "snap" from stress.

The psychological evaluations consistently described Singler as (1) having acted uncharacteristically on the night of the murder due to a "loss of impulse control" after being "taxed beyond his coping ability"; (2) having accepted responsibility promptly; (3) having embraced self-help courses; and (4) having achieved emotional stability.

As far back as 1986, a psychological evaluation described Singler's offense as "an isolated episode provoked by a marital conflict" and the "result of an explosive release of frustration and anger which had been building[] up over a period of several months."

An evaluation prepared in 1999 stated: "Given Mr. Singler's somewhat conservative working class background and his difficulty in coming to terms with his wife's relationship with another woman, . . . he overreacted and emotionally lost control."

An evaluation in 1989 opined that Singler has learned from his experience, accepts responsibility for it, and "would tend to approach even more serious situations in a very calm, rational manner."

A different therapist echoed this opinion in 1994, opining that Singler's maturation and experience in state prison "would induce him to deal with volatile serious situations in an even more rational controlled fashion."

The psychotherapist who evaluated Singler in 1990 observed that he "continue[d] to program in an outstanding and exceptional manner," and "[i]n a less-controlled setting, such as return to the community, he is likely to hold present gains and continue improvement."

A psychologist's report from 1995, which addressed whether Singler needed therapy, stated that limited clinical services would be more wisely utilized on other prisoners, and "Singler is indeed unusual for a prison population, being free from the customary concerns with regard to public safety, emotional stability and personal responsibility."

An evaluation in 1999 described Singler as having been an "active participant in a range of self-help groups and community based service type projects" and, thus, "he has gained significantly in emotional understanding and insights regarding himself."

Similarly, a 2002 evaluation described Singler as having taken steps to decrease his risk factors for future violent behavior.

And the most recent evaluation in 2006 stated that Singler had gained a higher level of maturity after participating in religious, educational, and occupational activities while in prison and that he had a low risk for violence outside of a controlled setting.

In sum, there is no evidence that Singler lacks insight into why he killed his wife. To the contrary, the evidence disclosed that for many years, Singler has understood the reasons why he killed his wife, has recognized that he significantly overreacted to his angry impulses in doing so, and has learned to harness in socially acceptable ways the anger arising from life's inevitable frustrations.

## III

We now turn to the question whether some evidence supports the Board's finding that the circumstances of the murder and disposal of the body demonstrate that Singler remains a danger to the public.

An inmate may be unsuitable for parole if he "committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1).)

However, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214, original italics.)

The fact that Singler disposed of Gayle's body in a rural area did not make the crime so "especially heinous, atrocious or cruel" (§ 2402, subd. (c)(1)) as to undermine the evidence that his rehabilitative efforts demonstrated he no longer would be a danger to public safety if released on parole. His disposal of the body was not equivalent to abusing, defiling, or mutilating it during or

after the offense. He says he simply attempted to evade detection by hiding the body. He revealed the location of the body the following day, and there is no evidence supporting a Board member's concern that wild animals could have ravaged the body in the interim. (*In re Elkins, supra,* 144 Cal.App.4th at p. 498 [given the lapse of 26 years and the rehabilitative gains made by Elkins, the continued reliance on the fact that he dumped the body down a steep grade at Donner Pass did not amount to " 'some evidence' " supporting the denial of parole].)

And the fact that Singler shot his wife as their children slept in the next room does not demonstrate the crime was so especially heinous, atrocious, or cruel that, despite Singler's rehabilitative efforts, he remains a danger to the public nearly a quarter of a century later. He did not attack, injure, or kill multiple victims; he did not carry out the offense in a dispassionate and calculated manner, such as an execution-style murder; the shooting did not demonstrate an *exceptionally callous* disregard for human suffering; and the motive for the crime was not inexplicable or very trivial. (§ 2402, subd. (c)(1).) Rather, all the psychological evaluations and uncontradicted evidence disclosed that Singler, as he claims, committed the offense while experiencing an unusual amount of stress over a long period of time, which is a factor indicating suitability for parole. (§ 2402, subd. (d)(4).) He became enraged upon learning that his wife was having an affair and that she planned to divorce him, take their children, and leave him destitute. This was an unacceptable reason to kill another human being—as are virtually all motives except for defense of self or others. However, viewed in context, it was not trivial, inexplicable, or dispassionate; and it did not reflect an exceptionally callous disregard for human suffering so as to undermine the uncontested evidence that his rehabilitative efforts showed he no longer would be a danger to public safety if released on parole. (See, e.g., *In re Roderick* (2007) 154 Cal.App.4th 242, 264–266 [65 Cal.Rptr.3d 16]; *In re Lee, supra,* 143 Cal.App.4th at pp. 1404, 1412.)

██ In sum, uncontested evidence established that Singler met every suitability factor listed in the regulations; his psychological evaluations were uniformly supportive; his Life Prisoner Evaluation Report was completely favorable and opined that he will reintegrate into society without incident; and his children, who were victimized by the murder, desired his release. Against this backdrop, Singler's crime, which occurred over two decades ago, was not so "especially heinous, atrocious or cruel" (§ 2402, subd. (c)(1)) to undermine the evidence that his rehabilitative efforts demonstrate he no longer would be a danger to public safety if released on parole. Therefore, the Board's decision to deny parole must be overturned.

## DISPOSITION

The petition for writ of habeas corpus is granted because the evidence presented at the 2006 parole hearing does not support the Board's finding that Singler was unsuitable for parole at that time. The Board is directed to hold a new hearing within 30 days of the finality of this decision and to find Singler suitable for parole, unless *new evidence* of his conduct and/or change in mental state *subsequent to the 2006 parole hearing* is introduced and is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole.

Nicholson, J., and Raye, J., concurred.