[No. B207448. Second Dist., Div. Three. Feb. 26, 2009.]

In re DANIEL RICO on Habeas Corpus.

**COUNSEL**

Michael Satris, under appointment by the Court of Appeal, for Petitioner Daniel Rico.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Jennifer L. Dolan, Deputy Attorneys General, for Respondent State of California.

**OPINION**

**ALDRICH, J.**—In 1993, petitioner Daniel Rico was convicted by a jury of second degree murder with a principal-armed enhancement. He was sentenced to a term of 16 years to life in prison. In 2007, the Board of Parole Hearings (BPH) for the third or fourth time found Rico unsuitable for parole, based solely on the gravity of his commitment offense. Rico challenged the BPH's 2007 decision by way of a petition for writ of habeas corpus in the superior court, which was denied. He then petitioned this court for relief, urging that the BPH's decision was not supported by "some evidence" he poses a current threat to public safety. We issued an order to show cause and requested the appointment of counsel for petitioner. We now conclude that the BPH's decision to deny parole is not supported by evidence that Rico's release would pose an unreasonable threat to public safety. Accordingly, we grant the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The commitment offense.*

In 1992, Rico, who was 19 years old, was a member of a gang known as The Magician's Club (TMC). He owned a primer-gray painted vehicle. In early March of that year, members of the rival White Fence gang shot at Rico's car as it drove down the street. Three days later, on March 6, 1992, Rico, accompanied by one or two passengers, drove his car down a street where three White Fence gang members were congregating around and inside another vehicle. One of Rico's passengers shot at one of the rival gang members, killing him with a single gunshot wound to the chest. On August 13, 1993, a jury found Rico guilty of second degree murder with a principal-armed enhancement. (Pen. Code, §§ 187, subd. (a), 12022, subd. (a)(1).) He was sentenced to 16 years to life in prison. We affirmed his conviction in 1995.

### 2. *Parole hearing history.*

Rico was received at the California Department of Corrections on October 29, 1993. His minimum parole eligibility date was November 6, 2002. The BPH denied parole at his initial suitability hearing in 2002, and again in 2006.[1] Rico appeals from a subsequent March 1, 2007 one-year denial. At that time he had been incarcerated for approximately 15 years. The following information was reviewed at the 2007 hearing.

### a. *Prior criminal record.*

Rico, who was born in 1972, left high school in the 10th grade, when he became involved with the TMC gang. He was arrested at age 15 for possession of a controlled substance, and completed a drug diversion program. In 1990, as an adult, he was arrested for carrying a loaded firearm in a public place (Pen. Code, § 12031, subd. (a)). He was placed on probation and served 30 days in county jail. In 1991, he was convicted of misdemeanor possession of a deadly weapon with the intent to assault another (Pen. Code, former § 467 [renumbered in 1994 as Pen. Code, § 12024]). Based on the only evidence in the record, the deadly weapon at issue was a stick.

---

[1] The record is unclear regarding whether an additional suitability hearing transpired in 2005.

b. *Rico's prison conduct.*

A "Disciplinary Sheet" provided by the warden shows that during his years of incarceration, Rico had two "CDC 115's,"[2] the last one occurring approximately 12 years before the hearing. An August 1994 CDC 115 was issued for having his name, Rico, tattooed on his stomach. The other, in May 1995, was for refusing a urinalysis test. Rico explained at the 2007 hearing that he had not been involved with drugs when he refused the test, but "still had a problem with authority" and did not wish to displease his cellmate by agreeing to be tested. He explained to the BPH that he has "completely gotten over" his issue with authority.[3]

Rico had seven "CDC 128's"[4] while incarcerated, the last one occurring in May 2000 for reporting late to work. The others were for having a window covering (July 1994), not returning to his cell (July 1995), not reporting to class (May 1997), contraband (July 1998), leaving an assignment without authority (Mar. 2000), and disobeying a direct order (May 2000).

At the 2007 hearing, the BPH noted that Rico had complied with its recommendations, made at an earlier hearing, to stay discipline free, learn a trade, get therapy, and earn positive "chronos." He had shown "continuous involvement since at least the year 2000" in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA). He had taken anger management classes. He had received positive "chronos" for good work and involvement in community projects.[5] He obtained his general education diploma (GED) in 1997 while in prison and, at the time of the 2007 hearing, was close to obtaining his associate of arts degree. He had worked in the optical, culinary, and welding departments, and as a porter. He had obtained certifications in small engine repair and quality management. He was classified as a "Medium A" prisoner,

---

[2] A "CDC 115" refers to a rules violation report that documents misconduct that is believed to be a violation of law or is not minor in nature. (*In re Roderick* (2007) 154 Cal.App.4th 242, 249 [65 Cal.Rptr.3d 16]; Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

[3] Rico explained, "I understand authority is needed and you know before[,] I'd be completely antisocial when it came to authority as far as even communicating. Part of it was fear and part of it was, you know, just . . . the mentality that's carried with being a gang member. But now I don't have those problems. I can talk openly with any person in authority. And I can follow rules that are imposed upon me and I follow the rules within the system here."

[4] A "Custodial Counseling Chrono" (CDC Form 128-A) documents minor misconduct and counseling provided for it. (*In re Roderick, supra,* 154 Cal.App.4th at p. 269, fn. 23; *In re Smith* (2003) 109 Cal.App.4th 489, 505 [134 Cal.Rptr.2d 781]; Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)

[5] Rico received laudatory chronos for exceptional work in 2002, involvement in a bicycle refurbishing project benefiting the Monterey County Kids Coalition in 2001, and participation in a Soccer League Work Day in 2006. Two correctional counselors had written memoranda praising Rico's positive attributes.

the lowest security level for a life term prisoner. (See *In re Roderick, supra*, 154 Cal.App.4th at p. 256, fn. 9.)

### c. *Parole plans.*

Rico, who was born in 1972, is a Mexican citizen whose family came to the United States when he was two years old. An ICE (Immigration and Customs Enforcement) hold has been placed on him. He recognizes that he will likely be deported when he is released, and cannot return to the United States unless there is "some legal way" he can do so. He speaks Spanish.

Rico's family is close-knit and his parents remain married; they have no history of domestic violence. He has at least two offers for job interviews and potential employment in the United States, from managers at two companies who are aware of his crime and history of incarceration. Rico also has at least four offers from relatives to house and support him in the United States, i.e., from (1) his parents, who have moved away from their old neighborhood; (2) from a brother who is gainfully employed and owns his own home; (3) from a sister who owns her own home, is employed and also has a family business; (4) from a brother in Michigan who owns a large home and believes he could obtain a job for Rico within a few days, due to his friendship with several local business owners; and (5) from a brother who was close to completing his master's degree from, and currently works at, the University of California Davis. That brother has offered to house, support, and provide assistance to Rico while Rico finishes his college degree at University of California Davis, and provide financial support if Rico is deported to Mexico after release. A first cousin who lives in Mexico and is employed as a manager of production has offered to house Rico and immediately provide him with employment at his company should Rico be deported.

### d. *Mental health evaluations.*

The most recent mental health evaluation, prepared on September 15, 2005, concluded that Rico was no more dangerous to society than the average person. Rico had no mental or emotional disorders. He had completely disassociated himself from gangs. The evaluation observed that although Hispanic gang activity in the prison was "serious and ongoing," Rico had been "very careful to disassociate himself from any kind of gang activities" and had "carefully stayed away from these political situations and peer-oriented situations. The fact that he has been able to maintain total independence shows that his desire[] to disassociate himself from anything illegal, criminal, or gang-related, is serious." The evaluation noted Rico's close, supportive family and vocational skills that would enable him to support himself if paroled. The psychologist found "no evidence of mental or

emotional problems in this case that would interfere with his being granted a parole date. Inmate Rico has a very good attitude. His seriousness, maturity, and his determination to change his lifestyle completely and live a responsible, prosocial life appear[] to be very serious. He impresses as being much more mature than the average, 33-year-old person. He maintains a good attitude towards his prison experience. There is no evidence of any bitterness or resentment in his responses. He openly acknowledges that he did wrong, and that he deserves the punishment he is getting. . . . [H]e does have strong family support in the United States, as well as in Mexico. The prognosis for successful adjustment in this case is excellent." The psychologist noted that Rico had "strong feelings of sorrow and remorse" which appeared sincere and genuine. Rico had a "good understanding of the dynamics associated with his behavior" at the time of the crime. He understood that he became involved in the gang because of peer pressure and had "changed significantly since the time of the commitment offense."

A 1996 report prepared by a prison psychologist stated, among other things, that Rico was working hard to turn his life around, and had chosen to separate himself from the TMC gang and gang-related activities or associations. There was no evidence of mental disorder. Rico's insight and judgment appeared higher than expected for someone with his age and history. He was "more mature than generally found in a Level IV inmate who is as young as he is."

A 2001 mental health evaluation was less glowing. As with the other evaluations, the examining psychologist found Rico did not suffer from any mental disorders. The evaluation stated that Rico admitted having a past drinking problem. The examiner also opined that Rico had abided by prison rules in an "off-and-on" fashion. In support of this finding, the evaluation cited Rico's CDC 115 violation for tattooing, and incorrectly stated that Rico had additional CDC 115 violations for mutual combat and possession of paraphernalia. It was unknown whether Rico would return to his prior gang affiliations if released; if so, he would present an above average level of danger to the community. The evaluation found it "interesting" that Rico at that time had no alternative parole plans that would have taken him away from the gang environment upon release. Because Rico had acknowledged a significant problem with alcohol, he needed monitoring and subsequent alcohol treatment.

e. *The BPH's decision.*

In a decision rendered orally by the presiding commissioner, the BPH denied parole, finding Rico was unsuitable because he would pose an unreasonable risk of danger to society or a threat to public safety if released

from prison. Before purporting to set forth the reasons for the denial, the presiding commissioner explained to Rico, "the decisions that we make are subject to an awful lot of review. They're reviewed by the Decision Review Unit and ultimately they're reviewed by the Governor. So any time we send something forward, if we see that there are areas of potential problem, it's not in anyone's best interest to do that and we . . . get that resolved, and that's one of the cases that we have with respect to you I think right now if this record were to go forward that it wouldn't stand scrutiny that it would be placed under. So what we're going to try to do is get that all cleaned up and tell you the areas that we think you could beef up a little bit to make yourself a better package." The board member stated that he did not see Rico spending the rest of his life in prison.

The BPH found the crime had been carried out in a dispassionate and especially cruel manner, demonstrating an exceptionally callous disregard for human suffering. The crime was a gang-related driveby shooting. The 26-year-old victim suffered a severe gunshot wound which injured both lungs, his aorta, and two ribs.[6] The presiding commissioner noted Rico's prior criminal record, and observed he had failed on a prior grant of probation. However, the presiding commissioner stated, "it's not what I would call a significant criminal record." He mentioned Rico's seven CDC 128-A counseling chronos and the two CDC 115 violations, but did not state that the prison conduct supported the denial. He noted that Rico's explanation for the urinalysis refusal was "certainly plausible." The presiding commissioner also expressed concern about "significant inconsistencies" between the 2001 and 2005 psychological evaluations, but did not state that any particular aspect of either evaluation, or the purported inconsistencies between them, supported a finding Rico was dangerous. Finally, the commissioners recommended that Rico update his support letters, find out if AA was available in the area to which he would be paroled in Mexico, stay discipline free, continue self-help, "get a back-up plan" to make himself more marketable, and prepare a closing statement that would demonstrate his insight into the crime.

### 3. *Habeas corpus petitions.*

Rico petitioned for a writ of habeas corpus in the Los Angeles County Superior Court, which was denied. Rico subsequently filed the instant petition for a writ of habeas corpus.[7] We issued an order to show cause on September 9, 2008.

---

[6] Inexplicably, the BPH also noted that the victim had ingested alcohol, PCP, and cocaine. This fact says nothing about Rico's conduct and, on this record, is not relevant to the suitability determination.

[7] Both parties have filed a variety of exhibits, and neither side objects to any of the exhibits offered by the other. We presume all were before the BPH, which had the opportunity to

In his petition, Rico contends that the BPH's denial was not supported by "some evidence." According to Rico, the nature of the commitment offense and his past criminal history are immutable, and can no longer support a parole denial.[8] Respondent, the Warden of the Correctional Training Facility (Warden), urges that the BPH's decision reflected individual consideration of Rico's suitability and was supported by some evidence that Rico's release on parole would pose an unreasonable threat to public safety. The Warden contends the BPH's decision was not based solely on the nature of the commitment offense, but instead was also based on Rico's criminal history, institutional behavior, inconsistent psychological evaluations, and inadequate parole plans. Further, the Warden asserts that if this court finds the BPH's decision violated due process, the matter must be remanded to the BPH so it can better explain its unsuitability finding.

## DISCUSSION

### 1. *Legal principles governing parole suitability determinations.*

Pursuant to Penal Code section 3041, subdivision (a), the BPH shall normally set a parole release date one year prior to an inmate's minimum eligible parole release date. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1202 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Singler* (2008) 169 Cal.App.4th 1227, 1237–1238 [87 Cal.Rptr.3d 319].) Release on parole "is the rule, rather than the exception." (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655]; see *In re Lawrence, supra,* at p. 1204.) A parole release date must be set unless the BPH determines that public safety requires a lengthier period of incarceration. (Pen. Code, § 3041, subd. (b); *In re Lawrence, supra,* at p. 1204; *In re Shaputis* (2008) 44 Cal.4th 1241, 1256 [82 Cal.Rptr.3d 213, 190 P.3d 573]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 [128 Cal.Rptr.2d 104, 59 P.3d 174].) Every inmate has a constitutionally protected liberty interest in parole decisions. (*In re Lawrence, supra,* at pp. 1191, 1205; *In re Rosenkrantz, supra,* at pp. 660–661; *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1486 [86 Cal.Rptr.3d 498].)

---

review Rico's central file and the transcript of a prior hearing. (See *In re Barker* (2007) 151 Cal.App.4th 346, 352 [59 Cal.Rptr.3d 746].)

[8] Rico's writ petition, prepared while he was acting in propria persona, additionally argues that the superior court's denial of the habeas corpus petition filed in that court was flawed for a variety of reasons. However, the denial of a petition for a writ of habeas corpus is not an appealable order, and we do not review the superior court's denial. Instead, Rico's writ petition is an original proceeding in this court. (*In re Scott* (2004) 119 Cal.App.4th 871, 877 [15 Cal.Rptr.3d 32]; *Durdines v. Superior Court* (1999) 76 Cal.App.4th 247, 250–251, fn. 5 [90 Cal.Rptr.2d 217].)

■ In determining suitability for parole, the BPH must consider certain factors specified by regulation.[9] (*In re Lawrence, supra,* 44 Cal.4th at p. 1202; Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).)[10] Circumstances tending to establish unsuitability for parole include that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) has a previous record of violence; (3) has an unstable social history; (4) has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison or jail. (Cal. Code Regs., tit. 15, § 2402, subd. (c); *In re Lawrence, supra,* 44 Cal.4th at p. 1202, fn. 7; *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 653–654; *In re Gray* (2007) 151 Cal.App.4th 379, 399–400 [59 Cal.Rptr.3d 724].)

■ Circumstances tending to show suitability for parole include that the inmate (1) does not have a juvenile record of assaulting others or committing crimes with the potential of personal harm to victims; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his or her life, especially if the stress built up over a long period; (5) committed the crime as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release, or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities suggesting an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d); *In re Lawrence, supra,* 44 Cal.4th at p. 1203, fn. 8; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 654.)

The foregoing factors are general guidelines, and the BPH must consider all reliable, relevant information. (Cal. Code Regs., tit. 15, § 2402, subd. (b); *In re Lawrence, supra,* 44 Cal.4th at p. 1203; *In re Shaputis, supra,* 44 Cal.4th at p. 1257; *In re Gaul* (2009) 170 Cal.App.4th 20, 31 [87 Cal.Rptr.3d 736].) The overarching consideration is public safety. (*In re Shaputis, supra,* at

---

[9] "Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

[10] California Code of Regulations, title 15, section 2402, "provides parole consideration criteria and guidelines for murders committed on or after November 8, 1978." (*In re Lawrence, supra,* 44 Cal.4th at pp. 1201–1202, fn. 5.) Title 15, section 2281, governs parole suitability when the murder was committed before that date. The two sections are substantively identical. (44 Cal.4th at pp. 1201–1202, fn. 5.)

p. 1254; *In re Lawrence, supra,* at pp. 1205, 1210, 1227; *In re Scott* (2005) 133 Cal.App.4th 573, 591 [34 Cal.Rptr.3d 905]; *In re Barker* (2007) 151 Cal.App.4th 346, 375 [59 Cal.Rptr.3d 746].)

### 2. *Standard of review.*

Our review of the BPH's decision is deferential. (*In re Lawrence, supra,* 44 Cal.4th at p. 1204; *In re Shaputis, supra,* 44 Cal.4th at p. 1254; see *In re Rosenkrantz, supra,* 29 Cal.4th at p. 665.) "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 658; see *In re Lawrence, supra,* at p. 1205.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence" are matters within the authority of the BPH. (*In re Rosenkrantz, supra,* at p. 677; see *In re Lawrence, supra,* at pp. 1204–1205.) "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor [or BPH],[11] but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports" the decision. (*In re Rosenkrantz, supra,* at p. 677; see *In re Shaputis, supra,* at pp. 1260–1261; *In re Lawrence, supra,* at p. 1204; *In re Burdan, supra,* 169 Cal.App.4th at p. 28.)

Recently, in the companion cases of *In re Lawrence, supra,* 44 Cal.4th 1181 and *In re Shaputis, supra,* 44 Cal.4th 1241, our Supreme Court resolved a split of authority in the appellate courts regarding whether there need only be "some evidence" of the factors cited by the BPH or the Governor in support of the parole denial, or whether there also must be "some evidence" that those factors demonstrate the prisoner's release would pose an unreasonable risk to public safety. (*In re Lawrence, supra,* at pp. 1208–1210; *In re*

---

[11] The Governor's and BPH's parole decisions must be based on the same factors, and the standard of judicial review is the same whether we are reviewing the Governor's or the BPH's decision. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 660; *In re Burdan* (2008) 169 Cal.App.4th 18, 29 [86 Cal.Rptr.3d 549]; *In re Hyde* (2007) 154 Cal.App.4th 1200, 1212 [65 Cal.Rptr.3d 162].)

*Shaputis, supra,* at p. 1254.) The court concluded that, "because the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision, the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." (*In re Shaputis, supra,* at p. 1254; see *In re Lawrence, supra,* at p. 1191.) The circumstances of the commitment offense, or any of the other factors related to unsuitability, "establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence, supra,* at p. 1212.) "This standard is unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Id.* at p. 1210; see also *In re Singler, supra,* 169 Cal.App.4th at p. 1239.)

Applying the law as now clarified by the California Supreme Court, we conclude the BPH's decision in the instant case is not supported by "some evidence."

3. *Application of criteria here.*

a. *The BPH's unsuitability finding was based solely on the gravity of the commitment offense, rather than on the additional factors cited by the Warden.*

As we read the BPH's comments at the hearing, the only factor cited in support of the parole denial was the nature of the commitment offense. The Warden, however, contends the BPH's unsuitability finding was based not only on the nature of the commitment offense, but also on Rico's criminal history, his inconsistent psychological evaluations, and his inadequate parole plans should he be deported to Mexico. The Warden further argues that, because Rico exercised his right not to discuss the commitment offense, "the Board did not have the opportunity to discuss Rico's insight and remorse with him and could not assess these aspects of his rehabilitation." We address these contentions seriatim and conclude the BPH did not find any of these factors tended to show unsuitability, nor would they have supported such a finding.

(i) *Criminal history.*

A previous record of violence is a circumstance tending to establish unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2); *In re Lawrence, supra,* 44 Cal.4th at p. 1202, fn. 7.) Here, the presiding commissioner detailed Rico's record and expressly stated, *"it's not what I would call a significant criminal record."* (Italics added.) Thus, the record does not support the characterization suggested by the Warden, i.e., that the BPH relied on Rico's criminal history as a factor supporting its unsuitability finding. (See *In re Vasquez* (2009) 170 Cal.App.4th 370, 385 [87 Cal.Rptr.3d 853]; *In re Roderick, supra,* 154 Cal.App.4th at p. 265 [courts may not salvage the BPH's inadequate findings by inferring factors that might have been relied upon]; *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643].) Rico's drug possession offense, occurring when he was 15 years old, did not involve violence. His other prior convictions, for carrying a loaded gun and for misdemeanor possession of a deadly weapon with the intent to assault, did not involve actual violence. All the evidence in the record regarding the latter offense indicates that the deadly weapon in question was a stick. Thus, Rico's prior criminal record, accurately characterized by the BPH as insignificant, does not constitute "some evidence" that he poses a current danger.

(ii) *Purportedly inconsistent psychological evaluations.*

The Warden's contention that the unsuitability finding was properly based on inconsistencies between mental health evaluations prepared in 2001 and 2005 is equally unavailing. The presiding commissioner stated at the 2007 hearing, "The area that we felt could potentially serve as a problem for you was . . . the psychological reports . . . . The Panel is concerned that there are some significant inconsistencies between the two reports, principally in three very critical areas: One, the assessment of dangerousness, the second in the clinical observations, and the third in the substance abuse. Understand clearly, we're not blaming you for this because as you said you just showed up and cooperated. But regardless of that, it does create an inconsistency *that potentially would be a red flag for any review authority.*" (Italics added.) The BPH ordered a new report to address any inconsistencies "so we can get rid of that issue for you."

These comments do not show the BPH found either evaluation, or discrepancies between them, suggested Rico was currently dangerous. The commissioner clarified that the BPH did not believe Rico was responsible for any discrepancy. The BPH did not question the conclusions or accuracy of the 2005 evaluation. Instead, the presiding commissioner's comments displayed concern that the BPH's decision would withstand review. In any event, a

comparison of the cited portions of the two evaluations (the sections regarding assessment of dangerousness, clinical observations, and substance abuse) demonstrate that the purported inconsistencies do not support a finding Rico is currently dangerous.

### A. *Assessment of dangerousness.*

The 2001 evaluation addressed two issues under the heading "Assessment of Dangerousness": Rico's record of prison discipline and the likelihood of his renewing his gang ties upon release. In regard to the former, the 2001 evaluation stated, "Inmate Rico has had an off-and-on record in the ten years he has been in a controlled setting. He has received CDC-115 violations for tattooing, possession of paraphernalia to use drugs, and mutual combat." The 2005 evaluation, referencing only CDC 115's, noted Rico had remained "entirely disciplinary-free for the last ten years." (See *In re Smith, supra*, 109 Cal.App.4th at p. 505.)

The 2001 evaluation appears to have been factually incorrect. The Disciplinary Sheet provided by the Warden with his return does not list CDC 115 violations for mutual combat or possession of paraphernalia. No evidence of these infractions was presented at the hearing, and the Warden does not argue Rico was actually disciplined for either. Otherwise, there was no contradiction between the two evaluations. The observation, in 2001, that Rico had complied with the rules in an on-again, off-again fashion did not conflict with the later observation that he had remained discipline free for a lengthy period; when the 2005 evaluation was written, all discipline was more remote in time than when the 2001 evaluation was prepared.

In any event, the BPH did *not* find Rico's prison conduct suggested he would present a danger if released. To the contrary, it praised Rico for his excellent record of prison behavior, stating, "you're to be commended for [remaining discipline-free since 2000]. I know it's difficult to survive in the institution in the absence of 115s, so that's certainly a decision on your part to remain disciplinary-free." Thus, the BPH viewed Rico's institutional history as a fact favoring a grant of parole.

In regard to the second issue listed under the "Assessment of Dangerousness" heading, the 2001 evaluation stated, "It is unknown whether or not the inmate would return to his prior gang affiliations if released from prison. If so, he would present an above average level of danger to the community. Since the inmate plans to return to the same environment he was arrested in and came out of, it is interesting to note that he did not have any alternative plans for staying out of the gang he was involved with at the time of his commitment offense." This comment does not conflict with the 2005 evaluation, which found Rico had disassociated himself from his former gang. It

simply demonstrates that by 2005, when Rico had continued his disassociation from the gang for several more years, the author of the 2005 evaluation was convinced Rico had renounced gangs, a conclusion the BPH appears to have credited. Further, by the time of the 2007 hearing, Rico had developed several alternative parole plans which would have allowed him to live away from his former neighborhood, mooting the concern in the 2001 evaluation that Rico would be moving back to the same area where he lived when he associated with the gang.

### B. *Substance abuse.*

Under the heading "Substance Abuse History," the 2001 evaluation stated, "Inmate Rico admits he had a past drinking problem which affected his life in negative ways. However, he denies any history of blackouts or DUIs. [¶] He has several chronos indicating that he has done very well in Alcoholics Anonymous treatment modalities while he has been incarcerated." The 2005 evaluation stated: "The previous psychologist noted a past drinking problem. This is not really accurate. Inmate Rico stated that he did not have an alcohol or drug abuse problem in the community. He had used alcohol, but it was very occasional, and not at all regular. He has been clean and sober now for 13 years. He did refuse a urinalysis test in 1995. He also has a teenage arrest for possession of marijuana, although he denies that this was a problem."

At the 2007 hearing, Rico was asked, "At any point in your early life, did drugs or alcohol come in?" Rico responded, "Alcohol. I drank alcohol. I experimented with alcohol when I was young. Drugs, no, but I did—I was arrested for possession of drugs, and that was mainly just a dumb decision to begin with and something that I was exposed [to] through gangs, and it's something that I used to elevate my status [with] members of the gang." The 1996 report stated Rico "does admit that he began drinking about the age of 16. He describes his level of consumption as being 'moderate to heavy, depending on the celebration.' He denies use of drugs."

In sum, all information in the record consistently states that Rico did use alcohol while in his late teens and did possess drugs once. The 2001 and 2005 evaluations do conflict regarding the extent of the alcohol use. However, we fail to see how the existence of this conflict supports a finding Rico presents a current danger if released. The 2005 evaluation stated Rico had been clean and sober for 13 years. Current psychological evaluations are generally most relevant to an assessment of current dangerousness. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1223–1224 [outdated psychological evaluations, which are contradicted by later evaluations, do not supply "some evidence"]; *In re Gaul, supra,* 170 Cal.App.4th at p. 38 [BPH's assessment of inmate's mental state was "irretrievably flawed by its reliance on a dated"

psychological report, where more recent, positive reports existed]; *In re Aguilar, supra,* 168 Cal.App.4th at p. 1490.) In any event, the 2001 report also stated Rico had done well in AA. At the 2007 hearing, the BPH noted his lengthy participation in AA and NA. There is no evidence in the record that Rico suffers from alcoholism or is addicted to drugs currently, or in the recent past; the BPH did not state it believed Rico had a problem with alcohol or drugs; and the BPH did not cite an alcohol or drug problem as a basis for its unsuitability finding. Thus, any inconsistency between the 2001 and 2005 evaluations regarding the extent of Rico's alcohol use as a teen does not support the finding of current dangerousness. (See *In re Smith, supra,* 109 Cal.App.4th at p. 505.)

### C.  *Clinical observations.*

The third portion of the 2001 report cited by the BPH was the material contained under the heading "Clinician Observations/Comments/Recommendations," as follows: "A. It is unknown whether this inmate is competent and responsible for his behavior. At times, he has had the capacity to abide by institutional standards, but has done so in an on-again, off-again manner. [¶] B. This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole. [¶] C. As this inmate has acknowledged a significant problem with alcohol, he would need monitoring and subsequent alcohol treatment to ensure the safety of the community." We have already discussed the 2001 evaluation's conclusions regarding Rico's institutional behavior and alcohol use *ante,* and have explained how these portions of the 2001 evaluation do not demonstrate a conflict with the 2005 evaluation that could support an unsuitability finding. The 2001 evaluation's finding that Rico had no mental health disorder is consistent with the 2005 evaluation. In sum, any purported inconsistencies between the reports do not amount to "some evidence" Rico currently presents a danger.

### (iii)  *Purportedly inadequate parole plans.*

The Warden also asserts the BPH's unsuitability finding was based on Rico's "inadequate parole plans for his deportation to Mexico." Far from finding Rico's parole plans were a factor tending toward unsuitability, the presiding commissioner stated: "The parole plans, you've done a good job." The commissioner advised Rico to get his letters updated for the next hearing, and to document the availability of AA in the area in Mexico to which he would be paroled. When advising Rico on what he should do to prepare for the next BPH hearing, the deputy commissioner stated: "I'm going to put another wrinkle to it and that's to get a backup plan. I know it's difficult even getting that, but certainly if you have a backup plan, it certainly

makes you more marketable for lack of a better word. That you not only have this but you have a backup plan should this not be available in terms of residence and terms of employment, as well as . . . the availability of any community-based organizations in Mexico because I know they're there. I know every city has got AA services in their town, so it's certainly something that you might want to pursue just as a backup plan."

We believe it mischaracterizes the record to assert, as the Warden impliedly does, that these comments indicate the BPH found Rico had inadequate parole plans in Mexico. The lack of a backup plan in Mexico was not cited as a basis for the unsuitability finding, but was offered as advice to make Rico "more marketable." Rico's plans included an offer by a relative, who resides in Mexico, to house Rico and provide him with a specified job at the factory where the relative was a manager. At least one of Rico's brothers had offered to provide financial support for Rico should he be deported. Given these offers, as well as the number of offers of support and assistance Rico already compiled, requiring yet another "backup plan" is arbitrary. (See *In re Andrade* (2006) 141 Cal.App.4th 807, 817 [46 Cal.Rptr.3d 317] [an inmate's parole plans need be realistic, but need not be ironclad or foolproof].)

(iv) *Insight into commitment offense.*

Next, the Warden argues that "[b]ecause Rico did not discuss the crime or his insight and remorse, the Board may reasonably assume" he has not gained sufficient insight into the crime, making the commitment offense probative of current dangerousness. This contention is unpersuasive. First, the BPH did not mention any purported lack of insight or remorse as a factor supporting its unsuitability finding. Second, it could not have done so. California Code of Regulations, title 15, section 2236 states: "A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and *the refusal shall not be held against the prisoner.*" (Italics added.) Third, despite the fact that Rico's attorney stated Rico would not speak regarding the crime, Rico, in fact, did so. He explained, "I would just like [to] stipulate that at my last and in this hearing, I've taken responsibility for the crime. And I accept the statement[] of facts for what they are (inaudible) my involvement in the crime." Rico stated that he had been very susceptible to peer pressure, was fearful of not being socially accepted, and was weak. "A lot of things that motivated me to do the things I did were in trying to please others and trying to fit in." He told the commissioners, "I want you to know that I'm sorry for what I did. I'm sorry for the taking of Daniel West."

Furthermore, Rico had discussed the crime with the psychologist who prepared the 2005 evaluation. That psychologist stated Rico "does have

strong feelings of sorrow and remorse associated with his involvement in the victim's death. His feelings of remorse appear to be sincere and genuine." Rico "does have a good understanding of the dynamics associated with his behavior at that time in his life. He stated that he began to associate with peers on the street. He then began to want to be accepted by them. Peer pressure led him into gang involvement and participation in gang activities." Further, "[w]hen looking back at that time in his life, he stated that his gang involvement was totally ridiculous. He stated he cannot understand how he could have believed in gang values like he did." Rico "stated that coming to prison was a very good thing for him; it totally interrupted the destructive lifestyle that he was engaged in at the time. It totally interrupted his peer dependence that he was experiencing at the time." In short, the evidence in the record documents that Rico has expressed genuine remorse and does have appropriate insight into the circumstances of the crime. The BPH did not find any lack of insight into the crime demonstrated Rico was currently dangerous, nor could it have done so on the record before us.

> b. *The other parole suitability criteria do not support a finding of current dangerousness.*

The other factors establishing suitability, which the BPH appears to have considered but did not find dispositive, support the view that the parole denial is not supported by some evidence. (See *In re Lawrence, supra*, 44 Cal.4th at p. 1226.) As we have discussed, Rico does not have a prior juvenile record of violence, and, except for the commitment offense, has no adult history of actual violence. The BPH considered Rico's prior criminal record insignificant, demonstrating it viewed this factor as one favoring release. There is no evidence Rico had a history of "unstable or tumultuous relationships with others," the definition of "[u]nstable [s]ocial [h]istory" in the regulations that govern the BPH's suitability determination. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3); *In re Gaul, supra*, 170 Cal.App.4th at p. 37; *In re Roderick, supra*, 154 Cal.App.4th at p. 267.) To the contrary, Rico's stable social history is evidenced by the many letters of support from his family. On the facts of this case, Rico's age (34 at the time of the 2007 hearing, and 36 currently) reduces the probability that he would rejoin a gang and reoffend upon release. Rico has no history of mental or psychiatric problems whatsoever. Rico did not commit sadistic sexual offenses. He has no recent history of serious misconduct in prison. Neither of the two CDC 115 rules violations, occurring approximately 12 years before the 2007 hearing, involved violence. Rico has been entirely free of any rules violation since May 2000, and has the lowest security classification possible for a life term prisoner. The BPH, as we have discussed, commended Rico for his conduct while incarcerated. As discussed *ante*, the psychological evaluation prepared in 2005 was positive, praising Rico's disassociation with gangs, maturity, insight, and dedication to turning his life around. The psychologist concluded Rico posed no more

threat of danger than any other citizen. The evidence that Rico has renounced all gang membership and affiliation was undisputed and apparently credited by the BPH. To the extent he ever had a problem with alcohol or drugs, he has successfully participated in NA and AA and, as of 2005, had been clean and sober for 13 years. He had developed an impressive array of plans to ensure he has housing, employment, and strong family support upon his release, including offers of support from family members in two states and Mexico who appear to be in a realistic position to assist him. While in prison he completed not only his GED but, at the time of the hearing, had almost completed his Associate of Arts degree. He has worked a variety of jobs in the prison system and has become certified in two fields, small engine repair and quality management. His educational and vocational achievements while in prison suggest an enhanced ability to function within the law upon release. In sum, the only basis for the BPH's unsuitability finding was the nature of the commitment offense. Accordingly, we turn to analysis of whether some evidence supports the BPH's finding that the nature of the commitment offense demonstrates Rico is currently dangerous.

### c. *Gravity of the commitment offense.*

#### (i) *Applicable standard.*

The nature of the inmate's offense can, by itself, constitute a sufficient basis for denying parole. (*In re Lawrence, supra,* 44 Cal.4th at p. 1221; *In re Shaputis, supra,* 44 Cal.4th at p. 1255; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 682; see also *In re Scott, supra,* 133 Cal.App.4th at p. 594.) However, "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*In re Lawrence, supra,* at p. 1211.)

The determination of current dangerousness is not dependent upon a comparison of the inmate's commitment offense with other, similar crimes, nor is it solely dependent upon whether the circumstances of the offense exhibited viciousness above the minimum elements required for conviction. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1220–1221; *In re Shaputis, supra,* 44 Cal.4th at pp. 1254–1255; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1098 [23 Cal.Rptr.3d.417, 104 P.3d 783].) "Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be

undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*In re Lawrence, supra*, at p. 1221; see *In re Shaputis, supra*, 44 Cal.4th at pp. 1254–1255.) "[A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*In re Lawrence, supra*, at p. 1214.)

Thus, where (1) evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming; (2) the only evidence related to unsuitability is the gravity of the commitment offense; and (3) that offense "is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur," the "immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.)

> (ii) *The gravity of the commitment offense, on the record presented, does not constitute "some evidence" Rico is currently dangerous.*

█ The regulations specify the factors the BPH should consider in determining whether an offense was "especially heinous, atrocious or cruel." Those factors are: (1) multiple victims were attacked, injured or killed in the same or separate incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled, or mutilated during or after the offense; (4) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; and (5) the motive for the crime is inexplicable or very trivial in relation to the offense. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

Evaluating these principles here, only factor (2) is supported by "some evidence." Multiple victims were not targeted. While two White Fence gang members were standing on the sidewalk, leaning against a car, and another was seated in the car, only one victim was shot, and only one shot was fired. The victim was not abused, defiled, or mutilated.

The BPH's conclusion the crime was carried out in an exceptionally callous manner demonstrating disregard for human suffering is not supported by some evidence. " 'The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious.' " (*In re Gray, supra*, 151 Cal.App.4th at p. 404, quoting *In re Lee* (2006) 143 Cal.App.4th 1400, 1410 [49 Cal.Rptr.3d 931]; *In re Lawrence, supra*, 44 Cal.4th at p. 1225.) The facts upon which the BPH apparently relied—that the victim suffered a gunshot wound causing injuries to his lungs, aorta, and ribs—are not some evidence of exceptionally callous disregard for human suffering. Murder necessarily involves some type of traumatic, serious bodily injury. There was no "infliction of severe trauma not involving immediate death" (*In re Barker, supra*, 151 Cal.App.4th at p. 373), and the single fatal gunshot at issue here cannot be characterized as exceptionally callous. Rico and his cohorts did not, for example, choose an especially painful or slow method for the killing, did not attempt to prolong or exacerbate the victim's suffering, did not terrorize, taunt, or torment the victim, and did not attempt to prevent him from obtaining aid.

Nor can the motive for the crime be fairly characterized as trivial or inexplicable. "An 'inexplicable' motive . . . is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (*In re Scott, supra*, 119 Cal.App.4th at p. 893; see *In re Barker, supra*, 151 Cal.App.4th at p. 374.) Rico's motive, while unlawful and wrong, was not *inexplicable*; the shooting was apparently committed in retaliation for the rival gang's shooting at Rico's car. Likewise, the motive cannot fairly be characterized as "trivial" in relationship to the offense. " 'Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." ' " (*In re Barker, supra*, at p. 374; see *In re Scott, supra*, at p. 893.) Shooting in retaliation for being shot at is indisputably wrong and unlawful, but on the facts of this case it cannot fairly be characterized as trivial.

■ There is, however, ample evidence in support of factor 2, that the crime was "carried out in a dispassionate and calculated manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(B).) The evidence suggests the shooting was calculated and possibly premeditated. Rico and his passenger came to the crime scene with a loaded gun protruding from the car, suggesting they were looking for rival gang members to shoot. Rico's passenger shot without any provocation by the victim. These facts were more than minimally necessary to sustain a second degree murder conviction because they demonstrated premeditation. (See *In re Dannenberg, supra*, 34 Cal.4th at p. 1095.) Premeditation, deliberation, and willfulness are not elements of second degree

murder. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].) Further, one of the circumstances tending to show suitability for parole is that the crime was committed as a result of stress in the defendant's life. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(4).) There is no showing that the murder in the instant case was committed due to stress that had built over a long period. Rico's vehicle had been shot at by members of the rival gang a few days prior to the shooting, but there is no evidence Rico was emotionally distraught about this circumstance.

However, the fact that the crime was heinous because it was carried out in a dispassionate manner and was not the result of long-standing stress does not, on this record, constitute "some evidence" that Rico would currently pose an unreasonable danger to society if he was released. "[F]ew murders do not involve attendant facts" supporting a conclusion the killing was especially heinous, atrocious or cruel. (*In re Lawrence, supra*, 44 Cal.4th at p. 1225.) The "relevant test is not whether some evidence supports the reasons cited for denying parole, but whether some evidence supports 'the core statutory determination that petitioner remains a current threat to public safety.' " (*In re Burdan, supra*, 169 Cal.App.4th at p. 36.) It is undisputed that the reason for the shooting was Rico's gang affiliation, an affiliation the record shows he long ago renounced. As the psychological evaluation stated, "At the time of the commitment offense, gang involvement was a definite risk factor. However, . . . gang involvement is no longer a factor in his life, and therefore it is no longer a risk factor." When the nature of Rico's crime is considered along with his current age, the lapse of time he has spent in prison, his genuine remorse and maturity, and his accomplishments in prison, the fact he was the driver in a gang-related driveby shooting in 1992 provides little if any predictive value about Rico's current dangerousness. (See *In re Lawrence, supra*, at pp. 1218–1219.) Indeed, the BPH did not explain how it arrived at the conclusion that the nature of the commitment offense demonstrated dangerousness; it simply recited that the crime had been egregious.

A comparison of *In re Lawrence* and *In re Shaputis* with the instant matter compels the conclusion that the BPH's decision is not supported by "some evidence." In *Lawrence*, the inmate had murdered her lover's wife after he reneged on a promise to leave the wife for Lawrence. Lawrence armed herself with a pistol and a potato peeler and accosted the victim at the lover's dental office. While the two women were engaged in a physical struggle, Lawrence produced the firearm and "fired wildly at" the victim, hitting her four times. (*In re Lawrence, supra*, 44 Cal.4th at p. 1193.) Lawrence then repeatedly stabbed the victim with the potato peeler. Lawrence told relatives that she committed the murder as a birthday present to herself. She fled and lived as a fugitive for approximately 11 years; when she finally surrendered to authorities she attempted to cast blame on the victim's husband, her former lover. A jury found her guilty of first degree murder. (*Ibid.*)

By the time of her last parole hearing, Lawrence had been incarcerated for 23 years and during that period had remained free of serious discipline. She had no criminal record other than the commitment offense. Evaluations prepared during the early years of her incarceration noted a variety of possible psychological problems including narcissism, borderline personality disorder, and antisocial disorder, but later reports showed Lawrence had no psychiatric problems. During her incarceration, she had racked up a long list of accomplishments, including earning her bachelor's degree and her master's degree in business administration; obtaining vocational training and participating in self-help; working as a physical trainer and a tennis coach for other inmates; and making major contributions to various charitable, educational, and public service programs at the prison. (*In re Lawrence, supra*, 44 Cal.4th at pp. 1194–1198.) The BPH four times recommended that Lawrence be paroled. Each time, however, the Governor reversed the BPH's recommendation, relying on the gravity of the commitment offense to justify continued confinement. The Governor concluded the facts the murder was premeditated, "shockingly vicious," and carried out for a petty reason, demonstrated Lawrence's release from prison would pose an unreasonable risk to public safety. (*Id.* at pp. 1221–1222.)

*In re Lawrence* concluded the Governor's reversal of the BPH's grant of parole was not supported by "some evidence." (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.) While the factors cited by the Governor—the use of multiple weapons, the premeditated nature of the offense, the cruelty attendant to the murder, and the petty motive—provided "some evidence" the crime was carried out in an especially heinous, atrocious, or cruel manner, those facts did not show Lawrence still posed a threat to public safety. (*Id.* at pp. 1224–1225.) "In light of petitioner's extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole, as well as the favorable discretionary decisions of the Board at successive hearings—decisions reversed by the Governor based solely upon the immutable circumstances of the offense—we conclude that the unchanging factor of the gravity of petitioner's commitment offense has no predictive value regarding her *current* threat to public safety, and thus provides no support for the Governor's conclusion that petitioner is unsuitable for parole at the present time." (*In re Lawrence, supra*, 44 Cal.4th at p. 1226.)

In contrast to *Lawrence*, in *In re Shaputis, supra*, 44 Cal.4th 1241, the court affirmed that a parole denial is not arbitrary or capricious when the circumstances of the crime continue to be predictive of current dangerousness, despite an inmate's excellent record during incarceration. There, petitioner Shaputis had been convicted of the second degree murder of his wife.

At the time of the parole hearing, he was 71 years old and in poor health. He had remained discipline free throughout his incarceration, had obtained numerous commendations from prison staff, and had participated in many prison programs, including AA and NA. However, Shaputis had a history of physical abuse of his first wife and their daughters. He had viciously abused the victim, his second wife of 23 years, including shooting at her, threatening to kill her, and beating her so badly she needed plastic surgery. He eventually killed her by shooting her in the neck at close range, after he had been drinking heavily. (*Id.* at pp. 1246–1248.) At the time of the hearing, he persisted in his view that the shooting had been an accident, despite evidence to the contrary. He had a long and violent criminal history including the alleged rape of his 16-year-old daughter, failing to register as a sex offender, failing to make child support payments, and at least one conviction for driving under the influence. He also had a history of violence when intoxicated. A recent psychological report found he presented a low risk of future violence as long as he maintained his sobriety, but that his risk of violence was unpredictable should he relapse into alcoholism. The psychological report also found "a 'schizoid quality' " to Shaputis's interpersonal relationships, and noted that he had limited insight regarding his antisocial behavior and the role his alcohol abuse played in his history of domestic violence. (*Id.* at pp. 1250–1252, 1260.)

The Governor reversed the BPH's grant of a parole date, a decision that was upheld by *In re Shaputis*. (*In re Shaputis, supra*, 44 Cal.4th at pp. 1245–1246.) The court concluded the aggravated nature of the murder indicated Shaputis posed a current public safety risk. (*Id.* at p. 1259.) The murder was not an isolated incident committed while the petitioner was subject to emotional stress that was unusual or unlikely to recur. Instead the murder was the culmination of many years of violent, brutal behavior toward the victim, his children, and his previous wife. (*Ibid.*) Further, Shaputis lacked insight or understanding into either his violent conduct or his commission of the offense. Although his age, poor health, and many years of sobriety could suggest he would not reoffend, this was a question for the Governor, not to be recalibrated by the courts. (*Id.* at p. 1260.)

Rico's case is far more like *Lawrence* than *Shaputis*. As in *Lawrence*, Rico's crime appears to have been an isolated incident, not the culmination of a pattern of abuse or violence. The crime was due to his gang membership, which the only evidence in the record shows he has renounced. This circumstance is important because, in the absence of Rico's gang membership—the driving force behind the murder—his conduct is unlikely to recur. As in *Lawrence*, and unlike in *Shaputis*, there is no evidence in the record that Rico currently poses a danger to society if released.

The Warden attempts to analogize the instant matter to *Shaputis*, arguing that, as in that case, Rico's record demonstrates a pattern of criminal activity similar to the behavior displayed in the commitment offense. The Warden attempts to bolster this argument by urging that Rico "acknowledged the gang mentality which caused him to rebel against authority" as evidence of unsuitability. We are unconvinced. It is true that in a prior parole hearing, Rico admitted the basis for his misdemeanor possession of a weapon conviction arose from his possession of a stick, while he was walking near the area where a gang-related melee had just concluded. At the current hearing, he stated that his drug possession at the age of 15 was due to his wish to elevate his status within the gang. However, there is no evidence Rico committed other gang-related shootings or violent crimes. The record does not reflect a long-standing pattern of criminal behavior and alcohol-fueled violence comparable to that in *Shaputis*. In any event, as we have discussed, Rico has since renounced his gang membership and the gang lifestyle. The BPH did not rely on a purported pattern of gang-related behavior in support of its unsuitability finding, and did not articulate any nexus between Rico's commission of relatively minor crimes between 1988 and 1991 and his current dangerousness.

Even less persuasive is the Warden's argument regarding Rico's acknowledgement to the examining psychologist that he had adopted the gang mentality as a young man. In context, it is clear Rico's statements were made to explain and condemn his conduct, not justify it. (See *In re Lawrence, supra*, 44 Cal.4th at p. 1222.) Rico's insight into his failings as a young man can only demonstrate that he has matured.

In sum, the record before the BPH at the 2007 hearing is devoid of evidence supporting a finding that Rico's release would pose an unreasonable risk to public safety. Rico was an accomplice in a reprehensible, gang-related driveby shooting of a rival gang member committed almost 17 years ago. However, the undisputed evidence demonstrates he has since renounced his gang affiliation, changed his attitude, remained free of serious discipline in prison since 1995, expressed genuine remorse, furthered his education and vocational skills, attended AA and NA, and developed realistic parole plans. On this record, "mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*In re Lawrence, supra*, 44 Cal.4th at p. 1227.)[12] Applying the

---

[12] Because we conclude the BPH's unsuitability finding was unsupported by some evidence, and accordingly grant the writ and vacate the denial of parole, we need not reach Rico's contentions that the BPH's parole denial was fundamentally unfair and arbitrary because it was the product of biased decisionmaking.

some evidence standard, we conclude the record fails to support the BPH's conclusion that Rico remains a current danger to public safety.

### 4. *Remedy.*

Having found the BPH's decision was not supported by some evidence, we must determine the correct remedy. The Warden asserts the matter should be remanded to the BPH so the BPH can "expressly state the reasoning behind its conclusion" and "fully articulate" the basis for its decision. Rico urges that he is entitled to immediate relief, i.e., either outright release or remand to the BPH with an order to set a parole date unless there is new evidence of unsuitability.

Remand to allow the BPH another opportunity to simply restate the basis for its decision is unwarranted on the record before us. The BPH has stated the basis for its unsuitability finding, and that finding was not supported by "some evidence." Further articulation of that flawed decision is unnecessary. (See *In re Burdan, supra,* 169 Cal.App.4th at p. 39; *In re Gaul, supra,* 170 Cal.App.4th at pp. 39–40.)

*In re Rosenkrantz, supra,* 29 Cal.4th at page 658, explained that if the BPH "decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." *Rosenkrantz* cited *In re Ramirez* (2001) 94 Cal.App.4th 549, 572 [114 Cal.Rptr.2d 381], disapproved on other grounds in *In re Dannenberg, supra,* 34 Cal.4th at page 1100. In *Ramirez,* the appellate court concluded the Board of Prison Terms had erred by failing to consider the proportionality of an inmate's sentence in relation to the determinate term prescribed for his crimes, or the gravity of his offenses as compared with other, similar offenses. (*In re Ramirez, supra,* at pp. 570, 572.)[13] *Ramirez* further concluded the trial court had erred by "making its own evaluations of the evidence before the Board, and by ordering the Board to set a parole date. In deference to the Board's broad discretion over parole suitability decisions, courts should refrain from re-weighing the evidence, and should be reluctant to direct a particular result. [Citation.] The Board must be given every opportunity to lawfully exercise its discretion" over the inmate's parole application. (94 Cal.App.4th at p. 572.)

---

[13] These aspects of *In re Ramirez*'s analysis were disapproved by *In re Dannenberg, supra,* 34 Cal.4th at pages 1070–1071, 1100.

Here, unlike in *Ramirez*, we have not found the BPH applied a flawed methodology in its decisionmaking process, necessitating reweighing of the evidence on remand. Instead, we have concluded there is an absence of evidence to support the BPH's unsuitability finding. Under these circumstances, "to 'proceed in accordance with due process of law' does not mean the Board, or the Governor, is to be given an opportunity to reconsider the parole decision" where there is not "some evidence" in the record to support the unsuitability finding. (*In re Burdan, supra*, 169 Cal.App.4th at p. 39.) As *In re Gaul* explained, "Having concluded that no such evidence exists in 'the full record before the Board' [citation], vacating the denial of parole and directing the Board to conduct a new hearing on the same record would be a meaningless exercise . . . ." (*In re Gaul, supra*, 170 Cal.App.4th at pp. 39–40 [the law does nor require idle acts].)

*In re Gaul* supported its conclusion by reference to the California Supreme Court's disposition in *In re Lawrence, supra*, 44 Cal.4th 1181. In *Lawrence*, the appellate court had granted Lawrence's habeas corpus petition and ordered her released forthwith, "notwithstanding the Attorney General's argument the matter should be returned to the Governor to permit him to determine whether some other basis existed for denying Lawrence parole." (*In re Gaul, supra*, 170 Cal.App.4th at p. 40.) The California Supreme Court affirmed the appellate court's judgment without modification. (*In re Lawrence, supra*, at p. 1229.) From this, *In re Gaul* reasoned, "Although *Lawrence* involved the denial of parole by the Governor, not the Board itself, we understand the Supreme Court's affirmance of our judgment to mean, when the reviewing court has determined there is no evidence in the record that would support the denial of parole, there is no reason to order the Board to conduct any further hearing on the matter, at least in the absence of some new evidence about the inmate's post-hearing conduct." (*In re Gaul, supra*, at p. 40; see also *In re Singler, supra*, 169 Cal.App.4th at p. 1245 [where the evidence at the parole hearing did not support the BPH's finding that the inmate was unsuitable for parole, the BPH was directed to hold a new hearing and find the petitioner suitable in the absence of new evidence of his conduct or mental state subsequent to the hearing].)

For these same reasons, we direct the BPH to find Rico suitable for parole unless new information, either previously undiscovered or discovered subsequent to the 2007 hearing, supports a determination that Rico poses an unreasonable risk of danger if released on parole.

## DISPOSITION

Rico's petition for a writ of habeas corpus is granted and the BPH is ordered to vacate its decision finding petitioner unsuitable for parole. The BPH is directed to conduct a new parole suitability hearing within 30 days of the issuance of the remittitur in this matter. At that hearing, the BPH is directed to find petitioner suitable for parole unless either previously undiscovered evidence or new evidence subsequent to the 2007 parole hearing, regarding his conduct, circumstances, or change in his mental state, supports a determination that he currently poses an unreasonable risk of danger to society if released on parole. Pursuant to California Rules of Court, rule 8.387(b)(3)(A), this opinion shall be final as to this court within five days after it is filed.

Croskey, Acting P. J., and Kitching, J., concurred.

On May 3, 2009, the opinion was modified to read as printed above.