[No. H035893. Sixth Dist. June 10, 2011.]

In re CHESTER L. RYNER on Habeas Corpus.

COUNSEL

Michael Kresser, under appointment by the Court of Appeal, for Petitioner Chester L. Ryner.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Steven G. Warner, Deputy Attorneys General, for Appellant The People.

OPINION

ELIA, J.—In this appeal by the People, we review whether the superior court properly granted Chester L. Ryner's petition for a writ of habeas corpus. Ryner's habeas corpus petition arose from a January 2010 decision by then Governor Arnold Schwarzenegger (the Governor) to reverse the August 11, 2009 decision of the Board of Parole Hearings (the Board), which had granted Ryner parole. For reasons that follow, we conclude that the superior court was correct in granting Ryner's petition for habeas corpus relief.

### Procedural Background

On March 18, 2010, Ryner filed a petition for writ of habeas corpus in superior court challenging the Governor's reversal of the August 11, 2009 decision of the Board to grant him parole. The superior court issued an order to show cause on April 2, 2010. On May 5, 2010, the People filed a return to the order to show cause. Ryner filed his traverse on June 1, 2010. On July 19, 2010, the superior court ordered that the August 2009 Board's decision granting parole should be reinstated. The People have appealed.

### Factual Background

*The Commitment Offense*

As did the Board at the August 11, 2009 parole suitability hearing, we take the facts of the underlying commitment offense from the probation officer's report in this case.

"On May 5, 1981, at approximately 10:00 p.m., a shooting occurred at the Red Spark Lounge located at 1151 South King Road in San Jose. Three people were shot and transported from the scene to Valley Medical Center for medical attention. Victim Darlene S. Mejia, aged 33, died from her wounds shortly after arrival at the hospital. Victims John C. Bernard, aged 21, and Louis C. Janacua, aged 41, sustained gunshot wounds and subsequently recovered from their injuries. [¶] Injuries to the deceased consisted of one gunshot wound entering her lower right chest and proceeding forward and left through the diaphragm, liver, right side of heart and striking a rib. Victim Bernard was shot through the left ring finger and left upper chest, while victim Janacua sustained a head injury wherein the bullet entered in front of the left ear and exited just under the right eye. Victim Bernard admitted an acquaintance with defendant Cordova and stated that he had met defendant Ryner on one prior occasion and that no animosity existed between any of them. Victim Janacua had no knowledge of either of the defendants. [¶] Witnesses attested to the defendants being under the influence of intoxicants upon entry into the lounge. Defendant Ryner became engaged in an altercation in the bar and he and defendant Cordova were ordered from the bar by the bouncer. After their removal, they returned and argued with the bouncer about having to leave a beer behind. Shortly [after], shots rang out from the doorway and their vehicle with two men inside was seen driving away from the scene. . . . [¶] Both defendants were arrested a short distance away and at the time of their arrest, defendant Ryner had a 22 bullet in his pocket."

In addition to the May 5, 1981 murder, on May 20, 1980, Ryner committed two assaults with a deadly weapon, a knife. The victims were Tito Diaz and Alfonso Rivera. These offenses were committed while Ryner was intoxicated.

*August 11, 2009 Board Parole Suitability Hearing and Decision*

At his August 11, 2009 parole suitability hearing, Ryner acknowledged that he had been drinking all day on May 5, 1981, and had smoked PCP in the afternoon. Ryner stated that he had possessed the .22-caliber revolver used in the 1981 murder for a few months and had test-fired it on the morning of May 5 and knew that it worked. He reloaded the gun after he test-fired it and admitted that he normally carried a weapon.

When asked why he was armed, Ryner explained that he had a lot of enemies in his neighborhood because when he got drunk he became angry and rowdy and was "always looking for trouble." Ryner acknowledged that he had fired the shots randomly into the crowded bar because he was angry about being pushed out of the bar without his beer and grossly overreacted.

Ryner indicated that the altercation at the bar started when he got into an argument with a girl who he had met earlier in the day. They had agreed to

meet at the bar, but she acted as if she did not know him, which made Ryner angry. The bouncer came over saying that Ryner had to leave. Ryner said he would leave when he finished his beer, but the bouncer kept pushing him out causing Ryner to get angrier and angrier. When he was arrested two hours after the shooting he was told that someone had been killed. Ryner said that at the time he did not realize he had hurt people and "felt real bad" when told that someone had died.

As to the stabbing incident, Ryner had been with Tito Diaz who had dated Ryner's little sister. Tito, who did not get along with Ryner's mother, made some negative comments about Ryner's mother to Ryner. Ryner jumped inside a vehicle and stabbed Tito, and then stabbed another person who tried to pull him away from Tito.

The Board stated that although it was mindful of the serious offenses that Ryner had committed in both the shooting and stabbing cases, it was unable to establish the required nexus between the commitment offenses and a current risk of danger to the community. The Board found Ryner had enhanced his ability to function within the law upon release through participation in education programs. The Board noted Ryner's "long and sustained participation in AA" and his involvement in anger management classes, his positive work record and vocational training. The Board stated that Ryner's probability of recidivism had been reduced because of maturation, personal growth, increased understanding and advanced age. The Board found that Ryner had realistic parole plans, including a job offer and family support. The Board noted Ryner's positive institutional behavior, including no disciplinary violations in 23 years and that he had never been disciplined for drugs or violence. The Board found that Ryner understood the nature and magnitude of the offense and had accepted responsibility for his criminal behavior and had shown a desire to change.

The Board referenced a 2008 psychological evaluation that had called for further exploration of the issues that caused Ryner to commit the crime. However, the Board noted that Ryner had addressed the issue of what caused him to commit the crime and why he carried a weapon.

The Board set Ryner's confinement time at 382 months and noted his service of 324 months.

*The Governor's Decision*

The Governor reversed the Board's findings on January 10, 2010. In a lengthy written decision, the Governor summarized Ryner's commitment offense, his criminal record and prison disciplinary record. The Governor

noted that he had considered various positive factors in reviewing whether or not Ryner was suitable for parole, including Ryner's efforts to enhance his ability to function within the law and his educational, vocational and work accomplishments. The Governor noted Ryner's participation in self-help and therapy programs including classes in substance abuse prevention, anger management and life skills; his close ties with a supportive family and friends; and his plans to live with his sister. However, because Ryner's release date would not be until 2013, the Governor noted that there was no way to know if those plans would still be viable in 2013.

Despite the positive factors that he considered, the Governor found that the murder Ryner committed "was especially heinous because it involved multiple victims who were especially vulnerable as they were unarmed and unsuspecting." He agreed with an April 2004 Board's statement that " '[T]he prisoner committed an offense in an especially atrocious and cruel manner[;] there were multiple victims attacked, injured, and one was killed in the same incident. The offense was carried out in a dispassionate manner which demonstrates an exceptionally callous disregard for human suffering . . . .' " The Governor stated that he agreed with a 2006 Board's statement that " 'the motive [for] the crime . . . certainly seems trivial now. It was basically anger associated with a dispute that [Ryner] had with the bouncer.' "

The Governor stated that he was concerned that Ryner had not yet accepted full responsibility for the murder because he had not fully examined the causative factors underlying the life crime. The Governor quoted from a 2008 psychological report, a portion of which stated that Ryner's level of insight into his antisocial traits and behaviors in the life crime was " 'weak' "; the Governor noted that the evaluator expressed concern that Ryner had been unable to explain the causative factors of his actions other than to say that he had been carrying a weapon simply because of the neighborhood in which he was living, the evaluator had hoped that Ryner would elaborate on this and expound on his statement at his parole consideration hearing that he fired the gun in order to scare people, and that Ryner's explanation that the crime turned violent because he had been involved in an argument could benefit from further exploration.

The Governor acknowledged that the August 2009 Board had found that Ryner had gained insight into the causative factors of his life offense, but disagreed that the record before him demonstrated that. He stated that an April 2009 Board panel had denied parole based in part on Ryner's lack of insight. Specifically, the Governor pointed out that in the "April 2009 hearing, Ryner told the Board that he had been carrying a weapon on the day of the crime because of 'the neighborhood I'm in . . . I had people looking for me all the time. . . . Because I was kind of rowdy back then.' He later

explained that he had grown up a 'skinny little kid [who] got picked on a lot . . . .' He described the events leading up to the life crime, stating, 'I got into an argument with someone and the bartender asked me to leave, and I sort of got angry. . . . I told him I'm going to finish my beer first, but he wouldn't let me finish the beer. So, . . . I threw the beer down and as I was walking out, I discharged my firearm into the building.' His explanations to the August 2009 Board provided few additional details. Instead, he again told the Board that he normally carried a weapon to protect himself from enemies that he made because he was a 'rowdy person.' When the August 2009 Board pressed further, Ryner simply explained that he had never fit in because, 'It was like a Mexican neighborhood and I was a white guy.' When the August 2009 Board asked Ryner if he had further explored the causal relationship between being asked to leave the bar and firing his gun, he merely responded, 'Well, like I said, it was mostly anger and plus it was an impulsive action.' He added only, 'That night I was angry . . . I grossly overreacted by shooting into the bar. . . . I wanted to scare everybody I guess.' " The Governor disagreed with the August 2009 Board that these additional explanations showed any deeper insight by Ryner.

The Governor concluded that the "evidence of Ryner's lack of insight into his actions in the murder render[ed] his life offense still relevant to my determination that he poses an unreasonable risk of danger if released to the public because Ryner cannot ensure that he will not commit similar crimes in the future if he does not completely understand and accept total responsibility for his criminal conduct." The Governor went on to say, "Given the evidence of Ryner's lack of insight into and failure to fully accept responsibility for his life offense, I am also troubled that he has not adequately participated in self-help or therapy during his incarceration."

*The Lower Court's Decision*

The Superior Court rejected the Governor's recitation of the aggravated nature of the commitment offense as indicative of current dangerousness, since the "fact that every murder can be called 'cruel,' 'callous,' and 'dispassionate,' reduces these adjectives to nothing more than an ever present aspect of the definition of murder itself. Thus, a Governor's statement that the crime was 'especially heinous,' or 'exceptionally callous,' as in this case, amounts to little more than the impermissible conclusion that every inmate may be denied parole because they committed the offense of murder for which parole 'shall normally [be] set' . . . . [¶] Beyond invoking the crime itself the Governor quoted from various Board decisions and indicated either his agreement or disagreement with them. The flaw in this approach is that prior Board decisions are not themselves evidence. In a similar context, the use of the subjective opinions of others has been rejected as follows: 'The

Governor purports to find support for his conclusion in "the District Attorney's opinion" that Dannenberg lacks sufficient insight into his crime. The district attorney's "opinion," like the Governor's belief, is not evidence, and therefore does not constitute "some evidence" supporting the Governor's decision.' (*In re Dannenberg* (2009) 173 Cal.App.4th 237, 255, fn. 5 [92 Cal.Rptr.3d 647].) So too here, the beliefs or opinions expressed in outdated Board decisions are not independent evidence."

The superior court rejected the Governor's finding concerning Ryner's lack of insight and acceptance of responsibility on the ground that the Governor had "parsed" reports and taken statements "out of context in an attempt to make this case analogous to *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573]. The Governor's disparagement of [Ryner]'s insight, remorse, acceptance of responsibility, or programming, is valid only in the sense that it is always possible for any person to improve himself. It is not persuasively (much less dispositively) cited as an indicator of present dangerousness or parole unsuitability in this case . . . . This case is clearly distinguishable from *Shaputis* . . . . If the statutory and constitutional availability of parole is to have any meaning, the test for its denial cannot be satisfied simply by the Governor's ability to cast [Ryner] and his crime in the worst possible light." Accordingly, the superior court reinstated the Board's decision granting parole.

## Discussion

### Standard of Review

"When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, as happened here, the question presented on appeal is a question of law, which the appellate court reviews de novo. [Citation.] A reviewing court independently reviews the record if the trial court grants relief on a petition for writ of habeas corpus challenging a denial of parole based solely upon documentary evidence." (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192 [92 Cal.Rptr.3d 36] (*Lazor*); see also *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*); *In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 [103 Cal.Rptr.3d 549] (*Criscione*).)

### Applicable Legal Principles

Pursuant to Penal Code section 3041, subdivision (a), the Board shall normally set a parole release date one year prior to an inmate's minimum eligible parole release date, unless it determines that public safety requires a lengthier period of incarceration. (Pen. Code, § 3041, subd. (b); *In re*

*Lawrence* (2008) 44 Cal.4th 1181, 1204 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*); *In re Shaputis, supra,* 44 Cal.4th at p. 1256 (*Shaputis*); *In re Shippman* (2010) 185 Cal.App.4th 446, 454 [110 Cal.Rptr.3d 326] (*Shippman*).) Release on parole is the rule, rather than the exception. (*Lawrence, supra,* at p. 1204; *In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655].)

However, when the Board determines an inmate convicted of murder is suitable for parole, the Governor has the constitutional authority to conduct a de novo review of the Board's decision. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2; *Lawrence, supra,* 44 Cal.4th at pp. 1203–1204; *In re Ross* (2010) 185 Cal.App.4th 636, 638 [110 Cal.Rptr.3d 811].) In conducting this review, the Governor is required to consider the same factors considered by the Board, which are specified by regulation.[1] (Cal. Const., art. V, § 8, subd. (b); *Lawrence, supra,* at p. 1204; Cal. Code Regs., tit. 15, § 2402, subds. (c) & (d).) However, the Governor has discretion to be " 'more stringent or cautious' " than the Board in determining whether a defendant poses an unreasonable public safety risk. (*Shaputis, supra,* 44 Cal.4th at p. 1258; see *In re Prather* (2010) 50 Cal.4th 238, 257, fn. 12 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*).)

■ Our review of the Governor's decision is deferential. (*Lawrence, supra,* 44 Cal.4th at p. 1204; *Shaputis, supra,* 44 Cal.4th at p. 1254; *Rosenkrantz, supra,* 29 Cal.4th at p. 665.) "[T]he judicial branch is authorized to review the factual basis of a decision . . . denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor." (*Id.* at p. 677.) "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a

---

[1] "Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports" the decision. (*Ibid.*; see *Shaputis, supra*, 44 Cal.4th at pp. 1260–1261.)

Nevertheless, the standard of judicial review of parole decisions " 'certainly is not toothless.' [Citation.] '[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights.' " (*Criscione, supra*, 180 Cal.App.4th at p. 1458.) Simply pointing to the existence of an unsuitability factor is not sufficient. "[N]ot only must there be some evidence to support the [Governor's] factual findings, there must be some connection between the findings and the conclusion that the inmate is currently dangerous." (*Ibid.*)

The Governor relied on three factors to conclude that Ryner was not suitable for parole—the nature of the commitment offense, his alleged lack of insight into the crime, and alleged inadequate participation in self-help, therapy, and anger management courses during his incarceration.

■   As to the gravity of the crime, the "Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.]" (*Lawrence, supra*, 44 Cal.4th at p. 1221.) "In some cases . . . the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Id.* at p. 1191.) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.) On the other hand, "the unexceptional nature of the commitment offense will not inevitably reflect a *lack* of current dangerousness without due consideration of the inmate's postconviction actions and progress toward rehabilitation." (*Id.* at p. 1218.)

■ Even if we were to give full credence to the Governor's characterization of Ryner's offense as "especially heinous," more is required under *Lawrence* to sustain the denial of parole based on the gravity of the commitment offense—namely, the presence of supported factors that are probative of a nexus between that gravity and the inmate's current risk to public safety if released. This is particularly true where, as here, the inmate has already served, or will have served by 2013 when the Board scheduled his release, sufficient time to satisfy a base term for the life crime. (*Lawrence, supra*, 44 Cal.4th at p. 1211 [after an inmate has served a suggested base term, the circumstances of the commitment offense alone will rarely provide a valid basis for denying parole in the presence of strong evidence of rehabilitation and no other evidence of current dangerousness].)

As the *Lawrence* court noted, "An evaluation of the circumstances of the crime in isolation allows a fact finder or reviewing court to determine whether a commitment offense was particularly egregious—a designation that we have seen applied in nearly every murder case considered by the Board or the Governor—and to conclude that the prisoner was a danger to the public *at or around the time of his or her commission of the offense.* Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1219.)

However, the People argue that the "interrelation of Ryner's lack of insight about the commitment offense—supported by Ryner's mental health evaluator's findings—inadequate self-help participation, and the commitment offense itself is some evidence supporting the Governor's conclusion that Ryner presents a current risk to public safety and is not suitable for parole."

The People assert that the superior court's conclusion that this case is not analogous to *Shaputis, supra*, 44 Cal.4th 1241, was incorrect. Respectfully, we disagree.

■ Neither Penal Code section 3041 nor the governing regulations list "lack of insight" as an unsuitability factor. However, in *Shaputis, supra*, 44 Cal.4th 1241, the companion case to *Lawrence* (see *Lawrence, supra*, 44 Cal.4th at p. 1191, fn. 2), the court upheld the denial of parole because the inmate's lack of insight into his offense and its causes together with the aggravated nature

of the offense supported a finding that he was currently dangerous and therefore unsuitable for parole. (*Shaputis, supra*, 44 Cal.4th at pp. 1258–1261 & fn. 20.)

Just as the heinous nature of the commitment offense became a standard reason to deny parole after *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], so too an inmate's lack of insight has become a standard reason after *Lawrence* and *Shaputis*, so much so that it has been dubbed the " 'new talisman' " for denying parole. (*Shippman, supra*, 185 Cal.App.4th at p. 481 (dis. opn. of Pollak, J.) [quoting a case that was later ordered not to be published].)

In *Shaputis, supra*, 44 Cal.4th 1241, the defendant shot and killed his wife. The California Supreme Court determined that "some evidence in the record support[ed] the Governor's conclusion that [Shaputis] remain[ed] a threat to public safety in that he ha[d] failed to take responsibility for the murder . . . , and despite years of rehabilitative programming and participation in substance abuse programs, ha[d] failed to gain insight into his previous violent behavior . . . ." (*Id.* at p. 1246.) Although the evidence was to the contrary, Shaputis nevertheless insisted the shooting had been an accident. The Supreme Court determined that, due to Shaputis's attitude and prior conduct, the commitment offense was not "an isolated incident, committed while [Shaputis] was subject to emotional stress that was unusual or unlikely to recur. . . . Instead, the murder was the culmination of many years of [Shaputis's] violent and brutalizing behavior toward the victim, his children, and his previous wife." (*Id.* at p. 1259.) In addition, Shaputis had "found 'inexplicable' his daughters' prior allegations of molestation and domestic violence [and] had a flat affect when discussing these allegations." (*Id.* at p. 1252.)

As *Shaputis* illustrates, a "lack of insight" into past criminal conduct can reflect an inability to recognize the circumstances that led to the commitment crime; and such an inability can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way. (*Shaputis, supra*, 44 Cal.4th at pp. 1260, 1261, fn. 20; *Lawrence, supra*, 44 Cal.4th at pp. 1214, 1228; *Lazor, supra*, 172 Cal.App.4th at p. 1202.) Thus, an inmate's "lack of insight" can provide a logical nexus between the gravity of a commitment offense and a finding of current dangerousness.

However, this case is not *Shaputis, supra*, 44 Cal.4th at pages 1251–1252, where the defendant had a " 'schizoid quality to interpersonal relationships' "; Ryner has no such history. Furthermore, Shaputis's lack of insight into his crime was rationally indicative of current dangerousness because it showed that he had not accepted full responsibility for his crime.

Certainly, Ryner's 2008 psychological evaluation, in the section entitled "Clinical/Insight," notes that Ryner could "benefit by becoming continuously involved in self-help" and his "level of insight into his antisocial traits and his behaviors in the life crime is weak." Here, the Governor relied in part on this selected excerpt to conclude that Ryner lacked insight into his crime. We point out the obvious—if Ryner has weak insight into his life crime he cannot *lack* insight, as to lack something means to not have it in the first place. (See Webster's 3d New Internat. Dict. (1993) p. 1261, col. 2 [lack means to be void or destitute of: be without or deficient in].)

■ Perhaps the Governor was concerned that Ryner lacks *sufficient* insight into the life crime. Of course, personal insight has long been recognized as a worthy goal. However, we have to question whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct. Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone. Indeed, the California Supreme Court has recognized that "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*Shaputis, supra*, 44 Cal.4th at p. 1260, fn. 18.) More importantly, in our view, one always remains vulnerable to a charge that he or she lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse. Moreover, we consider the very concept of "insight" to be inherently vague and find that whether a person has or lacks insight is often in the eye of the beholder. Hence, although a "lack of insight" may describe some failure to acknowledge and accept an undeniable fact about one's conduct, it can also be shorthand for subjective perceptions based on intuition or undefined criteria that are impossible to refute. (See, e.g., *In re Dannenberg, supra*, 173 Cal.App.4th 237, 255–256.) However, it is settled that the Board may not base its findings on hunches, speculation, or intuition. (*Lawrence, supra*, 44 Cal.4th at p. 1213; *Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

■ Evidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime.[2] To put it another way, the finding

---

[2] *In re Singler* (2008) 169 Cal.App.4th 1227, 1243 [87 Cal.Rptr.3d 319] (Board's finding was not based on a demonstrable lack of insight or lack of sufficient insight into a material aspect of offense and its causes), *Dannenberg, supra*, 173 Cal.App.4th 237, 255–256 (psychological reports reflected that the defendant had gained a great deal of insight into his offense, had acquired skills to enable him to avoid violence in the future, and he was not in need of

that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger.

Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous.

When given the opportunity to speak to the August 2009 Board, Ryner explained that "fear . . . led to [his] actions of [the life] crime." He told the Board, "Throughout my youth I was a coward, which led to my low self-esteem and into my antisocial behavior. Both my parents drank and I really didn't have any guidance. I started running with the wrong crowd trying to prove myself as being fearless. As I grew older I found it easier to hide my fears with alcohol and drugs. I became a terrible person using bad judgment, so bad I abandoned my children and my family. That ate me up inside. My anger grew and my impulsive behavior got bad, so bad I committed the senseless murder of Darlene Mejia and the bodily injuries of John Bernard and Louis Janacua. I overreacted by shooting into a crowded bar and by doing so, not only did I hurt the victims, but I hurt their families and the community as a whole, all because I was asked to leave without my beer. Alcohol and drugs fogged my judgment, but I wouldn't have—if I wouldn't have took that first drink or carried a weapon none of this would have happened. I blame my impulsive actions on the stabbings of Tito Diaz and Alfonso Rivera, I caused a lot of pain to them. Darlene Mejia's sons ended up in prison and I fault myself for that. As you can see by my past two decades, that I'm not the same man today as I was back the[n] when

---

further therapy. Although the Governor believed that these reports were wrong, the Governor's view was not evidence that the defendant lacked insight or, that he was currently dangerous), *In re Rico* (2009) 171 Cal.App.4th 659, 678–679 [89 Cal.Rptr.3d 866], abrogated on other grounds in *Prather, supra,* 50 Cal.4th 238 (court rejected a claim a lack of insight could be inferred from the defendant's failure to discuss his crime, insight, or remorse), *In re Roderick* (2007) 154 Cal.App.4th 242, 271–273 [65 Cal.Rptr.3d 16] (evidence showed that the defendant had a limited capacity either to understand or to explain the mechanisms that led to his criminality, but this limitation was a known quantity and has been factored into his risk assessment. Defendant's responses reflected acceptance of his alcoholism, acknowledgement of responsibility for his crimes, remorse, and shame), guide our view that "lack of insight" when it is invoked as a reason to deny parole must be based on an identifiable and material deficiency in the inmate's understanding and acceptance of responsibility for his or her commitment offense.

committing these terrible crimes. I learned from my self-helps that alcohol, drugs and violence are not acceptable to use for coping with stress and anger. I learned from AA in working the steps how to control my fear and alcoholism, by believing in a higher power and practicing these principles in all my affairs." As to why he normally carried a gun, Ryner explained to the Board that he had a lot of enemies due to the fact that he was a "real rowdy person." As to why he was "rowdy," Ryner explained that when he got drunk it would "enhance" his anger and he would always be looking for trouble. Ryner acknowledged that the alcohol made him a "potentially violent person." Ryner recognized the role that anger played in the life crime saying that he was angry "because the bouncer kept telling me to leave and he kept pushing me out the door and I don't want to leave without my beer and now I know it was a mistake, I grossly overreacted by shooting into the bar." As an explanation for why he shot into the bar, Ryner stated that he "wanted to scare everybody."

Given the foregoing, Ryner's claims regarding his mental state and motivation are entirely consistent with the record, entirely plausible and do not reflect a lack of insight. Further, there are no material factual discrepancies between the evidentiary record and Ryner's own account of his conduct and its causes. It appears that the "lack of insight" conclusion by the Governor is equivalent to a mere refusal to accept evidence that Ryner has acknowledged the material aspects of his conduct and offense, shown an understanding of its causes, and demonstrated remorse.

As distinct from the circumstances in *Shaputis*, the record before us demonstrates neither the type nor insufficiency of insight/failure to accept responsibility that would support an inference that Ryner will present a danger to the public if released on parole.

Finally, the Governor was concerned that Ryner had "not adequately participated in self-help or therapy during his incarceration" and had only participated in two documented courses dealing with anger management. Yet, after cataloging the numerous vocational and training programs in which Ryner had successfully participated, the Governor noted that Ryner had "availed himself of some self-help and therapy programs, including Alcoholics Anonymous, Life Skills, courses regarding the cause and treatment of various diseases, Cage Your Rage, Anger Management and Criminon. Moreover, he received positive evaluations from mental-health and correctional professionals over the years." Thus, the only interpretation of these juxtapositions must be that Ryner needs more therapy or must participate in more self-help and anger management courses.

■ We find nothing in the governing regulations that require any minimum quantity of rehabilitative programming. More importantly, the significance of rehabilitative programming comes into play only when *after years of such programming* a prisoner is unable to gain insight into his antisocial behavior *despite* those years of therapy and rehabilitative programming. (See *Shaputis, supra* 44 Cal.4th at p. 1260.)

With regard to the alleged lack of anger management classes, the Governor's decision that Ryner would present an unreasonable risk of danger to the public if released necessarily presupposes that Ryner still has anger management issues. The record does not support such an assumption. Ryner's 2008 psychological evaluation reported that Ryner had responded "adequately to treatment" and was "no longer impulsive." Further, the August 2009 Board's conclusion that Ryner has maintained positive institutional behavior, indicating a significant improvement in self-control is amply supported by the record. Ryner's last "CDC-115" was in 1986.[3] As Ryner's 2008 psychological report noted, Ryner "has handled compliance, stress, and destabilizers well within the institutional setting."[4]

The Governor faulted Ryner for failure to take more anger management courses, but there is no evidence that more course were available, or as demonstrated above that he needed more courses to deal with anger management issues. As such, the Governor's finding is based on no more than speculation. As noted, the Governor may not base his findings on hunches, speculation, or intuition. (*Lawrence, supra,* 44 Cal.4th at p. 1213; *Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

■ In sum, we have searched the record and have determined that the Governor's decision to reverse the Board's finding that Ryner is suitable for parole is not supported by the requisite "some evidence" in the record that Ryner currently presents an unreasonable risk of danger to the public if released on parole. The superior court properly granted the petition for a writ of habeas corpus.

---

[3] A Department of Corrections and Rehabilitation form "115" documents misconduct believed to be a violation of law that is not minor in nature. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2); *In re Gray* (2007) 151 Cal.App.4th 379, 389 [59 Cal.Rptr.3d 724].) The 1986 CDC-115 was for possession of a "tattoo gun."

[4] The Governor cited to an April 2009 Board finding that Ryner had not participated sufficiently in self-help to the point of being able to express why he lived the lifestyle he did leading up to his offenses. The Governor's reliance on the Board's finding is misplaced as it is not evidence. Moreover, that finding was predicated on Ryner's alleged inability to explain why he had adopted his alcohol and drug addicted violent lifestyle. However, Ryner offered a more comprehensive explanation at the August 2009 parole consideration hearing. The Governor's mere refusal to accept this further explanation is not evidence either. Moreover, the Governor gave no reason for rejecting the evidence in the record that is inconsistent with his finding.

█ Relying on *Prather, supra*, 50 Cal.4th 238, the Attorney General argues that this case must be remanded to the Governor. Respectfully, we disagree. At issue in *Prather* was the proper remedy to be ordered when the *Board's* decision to deny parole is not supported by some evidence that the prisoner remains a current threat to public safety. In such an instance, the Supreme Court concluded, "a decision granting habeas corpus relief . . . generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider." (*Prather, supra*, 50 Cal.4th at p. 244.) The reviewing court may not "direct the Board to reach a particular result or to consider only a limited category of evidence in making a suitability determination." (*Id.* at p. 253.) "Since *Prather* addressed a Board's denial of parole, we are not concerned with infringing on the authority of the executive. 'Here, in contrast, we reinstate an earlier executive branch decision—made by the Board—overturning only the "veto" of that decision by the Governor.' [Citation.] The power of the executive branch is, in this instance, not infringed, but respected. [Citation.]" (*In re Gomez* (2010) 190 Cal.App.4th 1291, 1310–1311 [118 Cal.Rptr.3d 900].)[5]

Furthermore, in *Lawrence, supra*, 44 Cal.4th 1181, which did address a Governor's reversal (*id.* at p. 1190), the Court of Appeal had ordered the inmate's immediate release, without return to the Governor for further consideration (*ibid.*). The Supreme Court affirmed. (*Id.* at p. 1229.) Accordingly, we must conclude that return to the Governor is not the appropriate remedy.

As this court noted in *In re Dannenberg, supra*, 173 Cal.App.4th 237, "Both the Second District Court of Appeal and the Third District Court of Appeal have rejected the contention that a remand to the Governor is appropriate under these circumstances. 'Because we have reviewed the materials that were before the Board and found no evidence to support a

---

[5] In *Prather*, the limitation that had been imposed on the Board's review infringed the authority of the executive branch to make the necessary parole determinations; our Supreme Court held this was a violation of the separation of powers established by the Constitution (Cal. Const., art. III, § 3). (*Prather, supra*, 50 Cal.4th at p. 253.) In contrast to the Board, which has the obligation and ability to take evidence, consistent with due process protections, the Governor cannot create an evidentiary record. (*Lawrence, supra*, 44 Cal.4th at p. 1203, fn. 9 [the Governor shall review materials provided by the parole authority].) Thus, a return to the Governor for reconsideration would mean that the Governor could look again only at the record before him on initial consideration. We have reviewed that record and determined that there is no evidence in the record that Ryner currently presents an unreasonable risk of danger to the public if released on parole. The Governor does not have the authority to " 'disregard a judicial determination regarding the sufficiency of the evidence [of current dangerousness] and to simply repeat the same decision on the same record.' " (*Prather, supra*, 50 Cal.4th at p. 258.)

decision other than the one reached by the Board, a remand to the Governor would amount to an idle act. [Citation].' [Citation.] '[W]here, as here, it is determined there is not "some evidence" in the record to support the Governor's decision to overrule the Board's grant of parole, the proper remedy is to vacate the Governor's decision and to reinstate that of the Board.' [Citation.]" (*Id.* at p. 256.)

## Disposition

The superior court's grant of Ryner's petition for writ of habeas corpus is affirmed. The Governor's decision reversing the Board's August 2009 decision granting Ryner parole is vacated and the Board's parole release order is reinstated.

Premo, Acting P. J., and Grover, J.,* concurred.

---

*Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.