Filed 9/28/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re ROYCE CASEY,<br><br>on Habeas Corpus. | 2d Crim. No. B321709<br>(Super. Ct. No. 21HC-0167)<br>(San Luis Obispo County) |

Royce Casey is serving a life term for the brutal murder of a 15-year-old girl. After Casey served 23 years three months, the parole board granted him parole. The Governor reversed the parole board's decision and denied Casey parole on the ground that Casey lacks insight into his crime. The superior court granted Casey's petition for a writ of habeas corpus. The People appeal from the court's order granting the petition. We reverse and remand.

FACTS

*Underlying Offense*

In 1995, when Casey was 17 years old, he was infatuated with "death metal" music. He started using drugs. He discussed with Jacob Delashmutt, 17 years old, and Joe Fiorella, 15 years old, sacrificing a virgin as part of a devil-worshipping ritual. The three crime partners planned the murder for several months.

Elyse Pahler, 15 years old, attended the same high school as the three partners. On the evening of July 22, 1995, Delashmutt and Fiorella told Casey that they had lured Pahler into joining them at a remote location in Arroyo Grande. They told her they were going to use drugs with her. Later that evening, Pahler joined them at the remote location to smoke marijuana.

After 15 to 20 minutes, Delashmutt pulled off his belt and began to strangle Pahler. Fiorella pulled out a hunting knife and stabbed her four to six times in her neck. Delashmutt took the knife next and stabbed her four or five more times in her neck. Finally, Casey took the knife and stabbed her four times in her back. As Pahler moaned on the ground, Casey stomped on the back of her neck.

After it was clear Pahler was dead, Delashmutt started to pull off her pants. The boys had discussed having sex with her after she was dead. Instead, Casey said that they should leave. They buried Pahler in a shallow grave and left the area.

About eight months later, with the crime still unsolved, Casey confessed his commission of the crime to a clergyman. The clergyman contacted law enforcement. Casey described the murder to the authorities and led them to Pahler's body.

*Parole Proceedings*

On March 17, 2021, the parole board found Casey suitable for parole. At the time Casey had served 23 years three months of a life sentence. Previously he was denied parole by the board in July 2016 and July 2019.

*Governor's Reversal*

In reversing the grant of parole, the Governor stated in part: "I have carefully examined the record for evidence that Mr.

Casey's insight and self-awareness have developed sufficiently to minimize his risk factors, including associating with negative peers, being swayed by violent and antisocial ideologies, and rationalizing brutal conduct for self-serving purposes. Mr. Casey's discussion of the causative factors for his involvement in the crime are concerningly lacking. At his parole hearing, Mr. Casey discussed his fear of judgement and need to be accepted saying, 'I've tried to please people to protect myself from perceptions of when I was a little kid and being hurt and not having the ability to communicate or to express or to ask… for help from people that can help me.' I have determined that Mr. Casey must do additional work to deepen his insight into the causative factors of his crime and coping skills before he can be safely released on parole." The Governor's insight and reason for denying parole more than meets the standard of "some evidence" in *In re Lawrence* (2008) 44 Cal.4th 1181.

### Superior Court

The superior court granted Casey's petition for a writ of habeas corpus. The court found that the Governor's decision is not supported by the evidence. The court granted the People a stay for this appeal.

### DISCUSSION

### Standard of Review

The power to grant or deny parole is vested exclusively in the executive branch. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2.) The Governor is authorized to identify and weigh all factors relevant to predicting "'whether the inmate will be able to live in society without committing additional antisocial acts.'" (*In re Lawrence, supra,* 44 Cal.4th at pp. 1205-1206.) The Governor's review of the parole board's decision is de novo and

3

may be more stringent or cautious in determining whether a defendant poses an unreasonable risk to public safety. (*In re Prather* (2010) 50 Cal.4th 238, 257, fn. 12.) Our review of the Governor's parole denial is limited to whether "some evidence" supports his conclusion that the inmate currently poses an unreasonable risk to the public. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1190-1191.)

*Governor's Denial Supported by Some Evidence*

The Governor may rely on the aggravated circumstances of the commitment offense as a basis for his decision to deny parole, but the aggravated circumstance do not in themselves provide some evidence of current dangerousness. (*In re Lawrence, supra,* 44 Cal.4th at p. 1214.) There must be something in the prisoner's history or his current demeanor and mental state that connects the aggravated circumstances of the offense with a finding of a continuing threat to public safety. (*Ibid.*) The failure to gain insight into the cause for the crime is a factor that shows a continuing threat to public safety. (*In re Shaputis* (2011) 53 Cal.4th 192, 218.)

Here there can be no dispute that the circumstances of the murder were aggravated. Casey and his companions brutally murdered a 15 year old girl. The Governor found that Casey remains a current risk to the safety of society because he lacks insight to the cause of the crime.

Casey explained that at the time he committed the murder he was hurt and angry. He thought that violence against someone who could not hurt him was an appropriate response.

But hurt and anger do not explain what Casey did. Nor does not being able to express himself and pleasing others even begin to account for his act. Almost everyone feels hurt and

4

anger at some point in their lives. Yet they do not plot for months to kill an innocent person and then execute the plan in a particularly brutal manner. Hurt and anger, a fascination with death metal music, the use of marijuana, all seem typical of many teenagers. Nothing Casey said explains the brutal murder of a 15-year-old girl. The Governor could reasonably conclude that Casey lacks insight into his crime.

Casey's reliance on *In re Van Houten* (2023) 92 Cal.App.5th 1 is misplaced. In 1971, a jury convicted Van Houten of two counts of first degree murder and one count of conspiracy to commit murder. The convictions arose from a series of brutal murders Van Houten participated in as a member of the Manson Family. The trial court imposed concurrent life sentences with the possibility of parole. Since her conviction, Van Houten has been a model prisoner, participating in 50 years of therapy, self-help programming, and reflection. She earned bachelor's and master's degrees and assisted other inmates in various ways, including as a tutor. The parole board found Van Houten suitable for parole on three previous occasions. On each occasion, the Governor denied her parole. In 2020, the parole board again found Van Houten suitable for parole. The Governor again reversed the board.

The Governor found Van Houten's explanation of what made her vulnerable to Manson's influence unsatisfactory. The Governor also stated that Van Houten's characterization of her participation in the double murder causes concern. The Governor concluded: "Given the extreme nature of the crime in which she was involved, I do not believe she has sufficiently demonstrated that she has come to terms with the totality of the factors that led her to participate in the vicious Manson Family killings. Before

she can be safely released, Ms. Van Houten must do more to develop her understanding of the factors that caused her to seek acceptance from such a negative, violent influence, and perpetrate extreme acts of wanton violence." (*In re Van Houten*, *supra*, 92 Cal.App.5th at p. 28.)

The trial court denied Van Houten's petition for writ of habeas corpus. The Court of Appeal reversed. The Court of Appeal conducted an exhaustive review of Van Houten's personal history and various assessments showing her successful transformation while in custody. The Court of Appeal concluded there is no evidence to support the Governor's decision to deny Van Houten parole and that "[t]he Governor's refusal to accept Van Houten's explanation amounts to unsupported intuition." (*In re Van Houten*, *supra*, 92 Cal.App.5th at p. 7.)

Van Houten is easily distinguished. At the time of her final parole hearing, Van Houten was over 70 years old. She had spent 50 years in prison participating in therapy, self-help programming, and reflection. She had three prior hearings at which she was found suitable for parole. Finally, Van Houten committed her crimes under the influence of cult leader Charles Manson, who is now deceased.

In contrast, Casey is 45 years old and, as far as the record shows, suffers from no psychological disabilities. He has not spent 50 years in therapy, self-help programming, and reflection. In fact, at the time of his parole hearing, Casey had not even served the minimum 25 year term. He did not have three prior parole hearings at which the board found him suitable for parole. Casey had two prior hearings in which he was denied parole. Finally, when Casey committed his crime, he was not acting under the influence of a cult leader. He acted fully of his own

6

accord to commit a brutal murder that he had planned for many months.

The dissent states that the Governor ignored evidence of Casey's insight. The dissent points to a 46 page statement made by Casey, 10 pages of which discussed the factors that led Casey to participate in murdering Pahler.

But the dissent fails to point to anywhere in the record that shows that the Governor ignored Casey's statement, or for that matter, ignored any relevant evidence. The Governor simply did not find such evidence convincing. "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677.)

The dissent's reliance on *In re Ryner* (2011) 196 Cal.App.4th 533, 549 is misplaced. There in 1981, Ryner, while intoxicated, got into a dispute with a woman in a bar. The bar's security removed him from the bar. Shortly thereafter, Ryner fired shots into the bar and escaped in a car. Three victims were hit. One died from her wounds. In a previous incident in 1980, a man made negative comments about Ryner's mother. Ryner stabbed the man and stabbed another man who tried to intervene. Ryner was intoxicated at the time.

In 2009, the parole board found Ryner suitable for parole. The board found that Ryner's probability of recidivism had been reduced because of maturation, personal growth, increased understanding, and advanced age. The Governor reversed the board's findings on the ground that Ryner had not fully examined the causative factors underlying his crime. (*In re Ryner, supra*, 196 Cal.App.4th at p. 541.) The trial court granted Ryner's

7

petition for writ of habeas corpus.  The Court of Appeal affirmed stating:  "Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous."  (*In re Ryner, supra*, 196 Cal.App.4th at p. 549.)  The statement may be true enough as applied to Ryner's case.  But each case must be decided on its own facts.

The murder Ryner committed was the result of an impulsive act.  The murder Casey committed was done after months of planning.  Moreover, Casey's actions reveal a level of depravity not seen even in most murders.  We are aware that aggravated circumstances of the crime are not alone sufficient to deny parole.  (*In re Lawrence*, supra, 44 Cal.4th at p. 1214.)  But aggravated circumstances coupled with what the Governor could reasonably conclude is inadequate insight justify denial in this case.

The dissent states that the Governor has failed to explain the causal connection between Casey's lack of insight and his current public safety risk.  But the connection is obvious.  Casey is relatively young and is physically capable of more violent crimes.  Without insight he also remains mentally capable of more violence.

## DISPOSITION

The judgment (order) is reversed and the matter is remanded to the superior court with directions to deny Casey's petition for writ of habeas corpus.

<u>CERTIFIED FOR PUBLICATION.</u>


GILBERT, P. J.


I concur:


YEGAN, J.

9

BALTODANO, J., dissenting:

I respectfully dissent.

When reviewing a parole-suitability determination made by the Governor, we evaluate whether " 'some evidence' " supports the conclusion that a life prisoner is unsuitable for parole because they currently pose a risk to public safety. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1191 (*Lawrence*).) "[T]he presence or absence of insight is a significant factor in determining whether" a prisoner poses such a risk. (*In re Shaputis* (2011) 53 Cal.4th 192, 218 (*Shaputis*).) " '[O]nly a modicum of evidence is required' " to uphold the Governor's determination that the prisoner does. (*Id.* at p. 210.)

Here, however, there is *no* evidence to support the Governor's conclusion that Casey lacks insight into why he murdered Elyse Pahler. In referencing Casey's "fear of judgement [*sic*]" and "need to be accepted" as the reasons for concluding Casey lacks adequate insight, the Governor relied on Casey's response to a question posed at his parole board hearing. The board asked Casey about the "people-pleasing" mentality that contributed to his criminal behavior. Casey explained:

> "[O]ne of the biggest fears I learned about myself is the fear of judgment. And, if I'm tied in that, and I'm more concerned about one, what someone thinks of me, in my past, *I've tried to please people to protect myself from perceptions of when I was a little kid and being hurt and not having the ability to communicate or to express or to ask what I—for help from people that can help me.* So being able to accept myself for who I am and that I have value as a person helps me to value others, because it helps me to see other people in the same light—as people. So I don't have

to prove I'm worthy of not being hurt.  So I don't have this need to protect myself.  And, then ultimately what it led to for me was a desire to hurt others because I blamed [them] for my pain, but it allows me to avoid that downward spiral.  So self-acceptance—not accepting what I've done in the past, as far as the horrible things I've done—but accepting myself as a person.  It stops me from having to prove to everybody I'm someone I'm not."  (Italicized portion quoted by the Governor.)

This statement—" 'made in the course of [Casey] condemning [his] own behavior' "—should not be held against him. (*Lawrence*, *supra*, 44 Cal.4th at p. 1222.)

The Governor also ignored other evidence of Casey's insight.  Prior to his hearing Casey submitted a 46-page statement to the parole board, 10 pages of which discussed the factors that led him to murder Pahler.  During the hearing Casey again discussed these factors—multiple times—and explained how he has learned to recognize when he is attempting to please people.  His evaluating psychologists commended these insights and said that Casey is "well prepared" to manage his historical risks.  So did the board tasked with determining Casey's parole suitability and assessing his demeanor, attitude toward his life crime, and remorse.  (Cal. Code Regs., tit. 15, § 2281, subds. (b) & (d).)  "Where, as here, undisputed evidence shows that [a prisoner] has acknowledged the material aspects of [their] conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the [prisoner] lacks insight, let alone that

2

[they] remain[] currently dangerous." (*In re Ryner* (2011) 196 Cal.App.4th 533, 549.)

Moreover, even if Casey lacks insight, the Governor has not explained any causal connection to a current public safety risk. (Cf. *In re Morganti* (2012) 204 Cal.App.4th 904, 925 [pertinent inquiry is "whether there is any *connection* between any lack of insight . . . and the conclusion that [a prisoner] is currently dangerous"].) This nexus is required if we are to uphold a parole unsuitability determination. (*Lawrence, supra,* 44 Cal.4th at pp. 1210, 1221.) Because one has not been shown to exist here, and because "the evidence reflecting [Casey's] present risk to public safety leads to but one conclusion," I would affirm the trial court's order upholding the parole board's grant of parole. (*Shaputis, supra,* 53 Cal.4th at 211.)

<u>CERTIFIED FOR PUBLICATION.</u>

BALTODANO, J.

Craig B. Van Rooyen, Judge

Superior Court County of San Luis Obispo

_____

Rob Bonta, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Julie A. Malone and Jennifer O. Cano, Deputy Attorneys General, for Appellant.

Charles Carbone, under appointment by the Court of Appeal, for Respondent.